**Byron INGRAM, Plaintiff,**

v.

**MARTIN MARIETTA LONG TERM DISABILITY INCOME PLAN FOR SALARIED EMPLOYEES OF TRANSFERRED GE OPERATIONS, an ERISA plan; and Does 1 through 20, inclusive, Defendants.**

**No. CV 98–2783 JSL.**

United States District Court, C.D. California.

Feb. 25, 1999.

Charles J. Fleishman, Beverly Hills, CA, for plaintiff.

Kenneth D. Sulzer, W. Michael Battle, Seyfarth, Shaw, Fair Weather & Geraldson, Los Angeles, CA, for defendants.

**JUDGMENT AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT**

LETTS, District Judge.

Before the court are cross-motions of plaintiff BYRON INGRAM and defendant MARTIN MARIETTA LONG TERM DISABILITY INCOME PLAN for summary judgment. Having reviewed the papers filed in connection with these matters, having heard oral argument, and being fully apprised of the relevant facts and law,

IT IS HEREBY ORDERED AND ADJUDGED that the plaintiff's for summary judgment be DENIED.

IT IS FURTHER ORDERED AND ADJUDGED that the defendant's motion for summary judgment be GRANTED.

### Factual Analysis

Plaintiff, Byron E. Ingram, is a former employee of General Electric Corporation ("GE"). While employed by GE, Ingram was insured by Metropolitan Life Insurance Company under the terms of a long term disability policy (the "Policy") issued pursu-

ant to a GE employee benefit plan (the "Plan"). Metropolitan Life Insurance Company (the "Plan Administrator") was both the administrator of the Plan, and the issuer of the Policy. The instant case arises out of the June 1, 1997 termination by the Plan Administrator of long term disability benefits paid to Ingram under the Policy. Ingram has sued to require the Plan to resume payments retroactively to the date of termination.

The facts upon which this decision is based are deemed by the court to be undisputed on the basis of direct evidence, or to arise by clear inference from undisputed direct evidence. The facts concerning Ingram's medical and work history recited in the Neuropsychological Report of Dr. Sheila Bastien, dated August 27, 1997 (the "Bastien Report") are accepted as having been known to the Plan Administrator through that document, and to have been alleged by Ingram or on his behalf, but are not accepted as true unless independently established as undisputed. The facts as to what was contained in the file upon which the Plan Administrator based its decision are not in dispute.

Ingram commenced employment with GE in 1988 as a manager of system installation equipment. Thereafter, he became a manager of field engineering, and then a program manager.

The file record of illnesses Ingram has suffered since the commencement of employment with GE begins in 1992. According to the Bastien Report, at some time during 1992, Ingram "became so ill that he reduced his work week to three days." The Bastien Report is not specific as to when this occurred, but does note that in November, 1992, Ingram was hospitalized for eight days after complaining of chest pains and a cough. At some time thereafter, according to Ingram, he told his supervisor that he would

have to quit his job because of his physical problems. The supervisor suggested that Ingram see a doctor and told Ingram that he would be laid off if there were a medical problem. On March 18, 1993, Ingram stopped working. He has not worked since. Ingram commenced receiving long term disability benefits under the Policy as of October 9, 1993.

The Plan Administrator defined "total disability" as a condition whereby "[f]or the first 24 months ... the employee must be unable to perform his or her regular occupation. After 24 months of receiving Long Term Disability Benefits, disability means complete inability to perform any job for which an employee is reasonably fitted by education, training or experience." [1]

Before causing the Plan to commence payment of long term disability benefits, the Plan Administrator was advised by Dr. James Kwako, Ingram's doctor, that Ingram was totally disabled by a disease identified as "Valley Fever." According to Dr. Kwako, this diagnosis was based on subjective symptoms reported by Ingram, combined with coccidental serology test results that indicated a complement fixation of 1:4 positive. The subjective symptoms that Ingram reported included fatigue, dizziness, disequilibrium, headaches, and cognitive dysfunction.

The Plan continued to pay Ingram total disability payments until October 9, 1995. That date marked the 24–month period after which Ingram no longer had to be unable to perform only his *"regular* occupation" to receive long term disability benefits, but had to be unable "to perform *any* job for which [he was] reasonably fitted by education, training or experience." (emphasis added.)

---

1. The Plan's definition of "total disability" differs from that set forth by the Plan Administrator in its correspondence with doctors examining Ingram. The Plan states that:

"Total disability" means that an employee is, because of illness or injury, unable to engage in any gainful occupation for which he is reasonable fitted by education, training or experience and is under the care of a physician, or psychologist, if necessary, for any treatment of his disability. However during the first twelve months of absence because of disability, the

employee will be considered totally disabled if he is unable, because of illness or injury, to perform any and every duty of his occupation held prior to his date of disability, lay off or leave of absence.

For the purposes of analysis, the court relies on the Plan Administrator's definition because it is the definition to which the parties refer in their papers. However, it should be noted that the choice to use one definition rather than the other made no difference to the ultimate findings and decision of the court.

Approximately three months before that date, in July 1995, Dr. Kwako had Ingram tested for Lyme's disease. Based on the test results, Dr. Kwako diagnosed Ingram with Lyme's disease. On October 15, 1995, Dr. Kwako opined that Ingram was still totally disabled.

On February 18, 1997, at the request of the Plan Administrator, Ingram was examined by Dr. Simon Jameson, an internal medicine and infectious disease specialist. On the same day, Dr. Jameson issued to the Plan Administrator a report of the results of his examination (the "Jameson Report"). The Jameson Report concludes that Ingram is not "totally and permanently disabled." The Jameson Report does not suggest that Ingram advised Dr. Jameson of any diagnosis by Dr. Kwako other than that of Lyme's disease. In his Report, Dr. Jameson opines that the diagnosis of Lyme's disease is "untenable." His opinion is based on the facts that there was no indication of tick bite, the principal cause of Lyme's disease, or of skin lesions, the most common manifestation, and that no confirmatory Western blot test was done after the coccidental serology test.

If the Plan Administrator had relied solely on the Jameson Report in deciding to terminate benefits, Dr. Jameson's use of the phrase "totally and permanently" in his report might be troublesome. The Policy requires only that the disability be "total." It does not require that the disability be "permanent." The Jameson Report, therefore, does not clearly negate the conclusion that Ingram was "totally" disabled. However, the Plan Administrator did not terminate payments based on the Jameson Report. Instead, before making any decision, the Plan Administrator referred its medical file, including the various reports of Dr. Kwako and the Jameson Report, to Dr. Robert Porter for review.

Dr. Porter, a board certified specialist in occupational medicine, issued his report (the "Porter Report") on June 12, 1997. The Port-

er Report discussed prior diagnoses of chronic fatigue syndrome, Epstein–Barr, Lyme's disease and Valley Fever, all of which appeared to Dr. Porter to have been diagnosed or suggested by Dr. Kwako.

As to chronic fatigue syndrome, Dr. Porter noted that the diagnostic criteria of the American College of Rheumatology had not been met. He further noted that Ingram had other medical causes that could contribute to his fatigue, including obesity, poor physical conditioning and frequently uncontrolled hypertension.

As to Epstein–Barr, Dr. Porter noted that there was no consensus definition of chronic Epstein–Barr, and that there were no corroborating changes in blood count studies or liver enzymes to support a diagnosis of chronic Epstein–Barr. In any event, according to Dr. Porter, "even if this illness were present, it resolves without treatment in a matter of weeks," and thus would not be a basis for concluding that later-observed symptoms were attributable to it.

As to Lyme's disease, Dr. Porter noted, as had Dr. Jameson, that Ingram had no history of tick bite and no observed skin lesions. Also consistent with Dr. Jameson, Dr. Porter noted the absence of the confirming Western immune blot test, which studies indicate is necessary to the diagnosis. Finally, Dr. Porter noted that Dr. Kwako had treated Ingram for Lyme's disease, and that the treatment did not have the effect it should have had if Ingram did indeed have Lyme's Disease.[2]

Dr. Porter noted that Valley Fever "is usually benign and self-limiting, and does not require treatment unless it is especially severe or becomes disseminated." He further noted that the 1:4 fixation result of Ingram's serum test did not meet the 1:16 fixation shown by studies to be necessary to reflect active disease or the 1:32 fixation shown to be necessary to show severe primary infection. Finally, Dr. Porter noted that neither

---

**2.** On March 13, 1997, Dr. Kwako sent a letter to the Plan Administrator in which he defended his diagnosis of Lyme's disease by saying: "Surly [sic] [Dr. Jameson] knows that a rash occurs only 80% of the time, and that a tick bite is recognized as low as 30% of the time. A prior test is positive. That is the main point, and a possible real explanation for part or all of the problem." This suggests that Lyme's disease would occur with evidence of neither tick bite nor rash in a small percentage of cases. This would appear to confirm the need for the Western immune blot test. Dr. Kwako fails to address that this test was not given.

the lab testing nor Ingram's post-diagnosis medical history indicated severe, disseminated or progressive illness.

As the court understood it, and as it would fairly have been understood by the Plan Administrator, the Porter Report convincingly refuted every medical explanation ever offered by Dr. Kwako for Ingram's reported subjective symptoms. This left Ingram's own medically uncorroborated descriptions of those symptoms as the sole basis for his claim of disability. On June 17, 1997, five days after receiving the Porter Report, the Plan Administrator discontinued payments to Ingram, retroactive to June 1, 1997.

Ingram appealed this decision through the administrative procedure provided by the Plan. In connection with the appeal, Dr. Kwako referred Ingram to a psychologist, Dr. Sheila Bastien.[3]

In the Bastien Report, Dr. Bastien provides a detailed recitation of Ingram's description of his physical and mental difficulties. If accepted at face value, the collective weight of the various maladies recited would provide substantial underpinning for Ingram's claim of total disability. The Bastien Report, however, also indicates that, according to Ingram, "[o]verall [the] symptoms have developed quickly, and have stayed about the same for the last six months." The symptoms were reported and purportedly observed for the first time very shortly after disability payments were discontinued; had the timing been different, the rapid development of multiple symptoms reflecting severe mental problems might appear quite different. It also would look rather different if the four years of prior disability payments by the Plan had not been supported by a variety of subjective symptoms and diagnoses ranging from dubious to false.

Unfortunately, the Bastien Report provides no substantial objective basis for believing that Ingram actually suffered from any of the mental problems that he described to Dr. Bastien. The Bastien Report does indicate that Ingram was given a number of recognized tests, and that the results indicate that he suffered mild to moderate impairment of some mental skills. The Report does not indicate, however, how Ingram fared on the portions of the tests designed to reveal and deal with the possibility of factitiousness, or whether the particular tests given even attempt to deal with that possibility. As to this, the Bastien Report states only that Ingram was given the Rey 15–Item Test, and that it revealed "no evidence of malingering."

In addition, the Bastien Report contains a number of statements that would seem curious even to a lay reader. For example, Dr. Bastien notes under the caption "Behavioral Observations" that Ingram "said he cannot even program his VCR correctly anymore." She also notes that "[h]is judgment is poor, and he has poor executive function. For two years he forgot to pay his motorcycle license and fees." These statements are curious both because the assumption that these examples suggest some mental deficiency seems unwarranted, and because although included as "Behavioral Observations," they seem to reflect behavior described by Ingram to Dr. Bastien, rather than behavior that she observed. Elsewhere in her Report, Dr. Bastien states, without any test or objective support, that Ingram "was obviously a brilliant, high functioning man at one time." Apparently based on this presumption, and without the benefit of prior I.Q. test scores, the Bastien Report concludes that Ingram's I.Q. test score of 118 represents an I.Q. loss "probably in excess of 15 points."

The court is aware of no basis for assuming that Ingram was ever a "brilliant, high functioning man." Nothing in the file concerning his employment record suggests any such thing. Indeed, unless legitimately attributed to the onset of some severe medical problem, Dr. Bastien's characterization of Ingram as overwhelmed by the job of small project manager would suggest quite the contrary.

Such examples, along with the rest of the Bastien Report, which seems to ignore entirely both the possibility that Ingram's symptoms are largely factitious, and the ap-

---

**3.** It should be noted that on every relevant form that he had theretofore provided to the Plan Administrator, Dr. Kwako had indicated that In-

gram had "no psychological problem that might interfere with [his] ability to work."

parent certainty that earlier diagnoses based on Ingram's claimed symptoms were medically unsound, would raise serious questions in the mind of any interested reader about Dr. Bastien's objectivity. The court's own view, after considering the entirety of the Bastien Report, was that the Plan Administrator would have been justified in dismissing the Report out of hand as lacking any color of validity.

The Plan Administrator, however, did not dismiss the Bastien Report out of hand; rather, the Plan Administrator referred the Bastien Report to Dr. Porter to see if it changed any of his prior opinions. The Bastien Report was then submitted to Dr. Robert G. Slack, a Diplomat of the American Board of Psychiatry, to determine whether it would form an independent basis for determining that Ingram was totally disabled.

On September 8, 1997, Dr. Porter issued a report (the "Porter/Slack Report") that included Dr. Slack's review. In the Porter/Slack Report, Dr. Porter noted that the Bastien Report contains no new medical information, and thus provided no basis for changing any of his opinions. As to the neuropsychological considerations, Dr. Slack opined, in part, as follows:

> The neuropsychological testing is extensive, complete, and well documented. There are, however, several significant problems with the interpretation of the testing by Dr. Bastien. In the beginning of the testing, Dr. Bastien pointed out a long history of complaints from Mr. Ingram that cover most medical systems. They are extensive, complete, and overwhelming, but are inconsistent with reported physical findings....
>
> It is also interesting to note that in testing that required Mr. Ingram to provide information, he gave approximate answers. This is ... typical, though not diagnostic, of a factitious disorder....
>
> His approximate answers and scattered difficulties on the test ... raise, but do not answer, the question of factitious respons-

es. The only point in the testing that stresses the issue of his motivation is the Rey 15–Item Test, in which there was no evidence of malingering. This does not, however, rule out malingering in other parts of the test.

> The neuropsychological testing comment summary showed evidence of scatter and minimal impairment in some areas with completely normal functioning in other areas.... Nevertheless, the testing clearly established that the option or choice of performing a large number of residual occupational opportunities remains with Mr. Ingram.[4]

After receipt of the Porter/Slack Report, the Plan Administrator completed its appellate review, and upheld the denial of further payments to Ingram. Ingram then filed this suit.

### Standard of Review

In *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed *de novo,* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Otherwise, the court is to review the administrator's determination to ascertain only whether it was arbitrary and capricious. The Court further explained that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Id.* (citation omitted).

In this case, the Plan assigned the Plan Administrator discretionary authority to determine whether Plan participants were eligible for benefits. Specifically, the Plan states:

> The carrier will make all decisions on claims and has reserved the right to examine medically an individual for whom the

---

4. The file contains a large number of letters from Ingram to the Plan Administrator regarding his claim. Most were written after Ingram was seen and tested by Dr. Bastien. The striking contrast between these forceful, assertive, clear-speaking letters, and the "confused and disoriented ... [individual who] has difficulty processing and understanding new information" described by Dr. Bastien also raises questions about the objectivity of Dr. Bastien, and the care with which she considered the possibility of a factitious disorder.

claim is made at any time during the period of disability.

Accordingly, the management and control of the operation and administration of claims procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of claim denial pursuant to section 503 of the Act, shall be vested in the carrier.

Thus, the court is to review the Plan Administrator's decision under an arbitrary and capricious standard. For the reasons explained below, however, the court finds that issues concerning the standard of review are irrelevant, because the court would reach the same conclusion under either a *de novo* or an arbitrary and capricious standard.

### Discussion

In considering whether the Plan Administrator abused its discretion under the Plan, the court has applied a traditional abuse of discretion standard.[5] In order to satisfy the requirement of *Firestone,* the court must ensure that it has before it all of the relevant facts, and that it does not draw inferences from those facts without remaining constantly aware that the Plan Administrator is saving its own money when it decides to terminate a plan participant's benefits. These requirements have been met.

As is clear from its opinion in *Dishman v. UNUM Life Insurance Co. of America,* 1997 WL 906146 (C.D.Cal.1997), the court understands fully that a disabled person can suffer tragic consequences when a plan administrator's acts are guided by self-interest rather by the Plan's obligations to beneficiaries.[6]

The court views this case, however, as showing the "other side of the coin." Insurance companies can also be victimized by persons acting in unbridled self-interest. It cannot be assumed that everyone claiming to be totally disabled is, in fact, totally disabled. After a short visit to a library reference room, one who suffers from no actual disability may have little difficulty feigning and describing symptoms that invite a well-chosen doctor to opine that the patient is totally disabled. If each time one diagnosis is refuted another is substituted, and new symptoms appear over time, a fraudulent claimant may present a continuously moving target with which an insurer may never be able to catch up.

As previously stated, the court's own conclusion, reached *de novo,* agrees with that of the Plan Administrator: It is more probable than not that Ingram is not totally disabled. *A fortiori,* the court cannot find that the Plan Administrator's decision was arbitrary and capricious. While it is possible that all of the various reasons for doubting Ingram's claim could have coalesced by coincidence in a valid claim, this possibility does not even approach a probability. The court understands, and appreciates fully, the personal tragedy that would follow from an erroneous conclusion that the termination of Ingram's disability benefits was justified. As a matter of law, however, the court cannot permit this consideration to influence its decision. It is reassuring, therefore, that, in this case, the possibility of such error seems so slight.

The motion of defendant for summary judgment is therefore GRANTED.

IT IS SO ORDERED AND ADJUDGED.

---

**5.** *See Watkins v. Westinghouse,* 12 F.3d 1517 (9th Cir.1993) (interpreting *Firestone* to mean that the court must review with heightened scrutiny whether the administrator abused its discretion); *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322 (9th Cir.1995) (holding "that this 'heightened standard' does not alter our traditional abuse of discretion review in the absence of specific facts indicating that [the administrator's] conflicting interest caused a serious breach of the plan administrator's fiduciary duty to ... the plan beneficiary.").

**6.** "[F]or [ERISA] benefit plans funded and administered by insurance companies, there is no practical or legal deterrent to unscrupulous claims practices. Absent such deterrents, the bad faith denial of large claims, as a strategy for settling them for substantially less than the amount owed, may well become a common practice of insurance companies." *Id.* at *11.