Byron INGRAM, Plaintiff–Appellant,

v.

MARTIN MARIETTA LONG TERM DISABILITY INCOME PLAN FOR SALARIED EMPLOYEES OF TRANSFERRED GE OPERATIONS, an ERISA Plan, Defendant–Appellee.

No. 99–55581.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 17, 2000

Filed April 4, 2001

Charles J. Fleishman, Beverly Hills, California, for the appellant.

W. Michael Battle, Los Angeles, California, for the appellee.

Before: T.G. NELSON and W. FLETCHER, Circuit Judges, and EDWARD C. REED, Jr.,[*] Senior District Judge.

WILLIAM A. FLETCHER, Circuit Judge:

Byron Ingram is a former employee of General Electric Corporation, where he received as one of his benefits a long term disability insurance plan under the Employee Retirement Income Security Act ("ERISA") administered by Metropolitan Life Insurance Company ("MetLife"). Ingram stopped working in 1993 and claims that since that time he has been totally disabled within the meaning of the plan. When MetLife terminated his disability benefits in 1997, Ingram brought suit in district court under 29 U.S.C. § 1132(a)(1)(B). He now appeals the district court's grant of summary judgment to MetLife.

The central issue in this case is whether the district court should have reviewed MetLife's denial of benefits under a *de novo* or an abuse of discretion standard. We hold that review should have been *de novo* and we reverse and remand for further proceedings.

---

[*] Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Neva-da, sitting by designation.

## I

In late 1992, Ingram developed chest pains and a cough severe enough to require eight days of hospitalization. He stopped working by March 18, 1993. In December of 1993, with the support of his physician, Ingram applied for and received benefits under the plan retroactive to October 9, 1993. The physician, Dr. James Kwako, reported that Ingram tested positive for coccidiomyosis (commonly known as "valley fever") and listed his symptoms as "fatigue, dizziness, disequilibrium, headaches [and] cognitive dysfunction." On the basis of these findings, Kwako described Ingram as "totally disabled." Over the next four years, Kwako regularly attested in writing to Ingram's total disability, diagnosing numerous ailments including chronic coccidiomyosis and Lyme disease. Ingram was also examined by a sleep specialist who diagnosed him with severe but treatable obstructive sleep apnea.

On February 18, 1997, Dr. Simon Jameson, an infectious disease and internal medicine specialist, examined Ingram at MetLife's request. Jameson found that although Ingram had several physical ailments, he was not "totally and permanently disabled." He disputed Dr. Kwako's finding of Lyme disease, and suggested that at least one of Ingram's symptoms-his awkward gait-might have been factitious. MetLife sent Jameson's report and all of Kwako's findings to a third physician, Dr. Robert Porter, for independent review. Based on a review of Ingram's medical records (but not an examination of Ingram himself), Porter reported to MetLife that there was "insufficient documentation of a condition of a severity to cause impairment in Mr. Ingram to preclude work." Shortly thereafter, MetLife terminated Ingram's disability benefits.

Ingram asked MetLife to review its decision, and further supported his claim

**1112**

with the findings of a psychologist, Dr. Sheila Bastien. Based on four evaluation sessions with Ingram, Bastien had prepared a fairly lengthy report on Ingram's condition. She reported that Ingram's "current diagnoses" were for chronic fatigue syndrome, Epstein–Barr, Lyme disease, valley fever, and multiple chemical sensitivity. To these, she added a psychological diagnosis of mild dementia, and concluded that "Byron Ingram is totally and completely disabled from any gainful employment at present." MetLife had Bastien's report reviewed by an independent psychiatrist, Dr. Robert Slack, who disputed Bastien's diagnosis of dementia and stated that "a large number of residual occupational opportunities" remained open to Ingram. MetLife then reevaluated the termination of Ingram's disability payments. It once again concluded that he was not totally disabled.

Ingram brought suit under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). The district court granted summary judgment against Ingram, from which he now appeals. We review a district court's grant of summary judgment *de novo*. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000).

## II

■ Depending upon the language of an ERISA plan, a district court reviews a plan administrator's decision to deny benefits either *de novo* or for abuse of discretion. The *de novo* standard is appropriate "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). As we recently stated in an en banc decision, "[A]n administrator ha[s] discretion only where discretion [is] 'unambiguously retained.'" *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir.1999) (en banc) (quoting *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th Cir.1992)). "[T]he default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary

authority in order to get any judicial deference to its decision." *Id.* at 1089.

■ We therefore examine the text of MetLife's disability plan to determine whether it "unambiguously" states that MetLife has "discretionary authority" in making benefits decisions. The plan states, in relevant part:

> The carrier solely is responsible for providing the benefits under this Plan.... The carrier will make all decisions on claims and has reserved the right to examine medically an individual for whom claim is made at any time during the period of disability. Accordingly, the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of claim denial pursuant to Section 503 of the Act, shall be vested in the carrier.

We discuss the statements upon which MetLife relies in the order in which they appear.

The plan first states that "[t]he carrier solely is responsible for providing the benefits under this Plan." This statement makes clear that only MetLife, the "carrier," pays benefits under the plan; that is, the insurance carrier rather than the employer is responsible for providing benefits. The statement says nothing about how benefit determinations are made.

Second, the plan states that "[t]he carrier will make all decisions on claims...." This statement cannot mean that MetLife makes all decisions in the sense that its decisions are final and unreviewable, for ERISA provides that a plan administrator's decisions are always subject to judicial review. *See* 29 U.S.C. § 1132. Rather, this statement, like the first, allocates responsibility in the administration of the plan. It makes clear that MetLife, rather than the employer or some other party, makes all administrative decisions to grant or deny claims. An allocation of decision-making authority to MetLife is not, with-

out more, a grant of discretionary authority in making those decisions. *See Cathey v. Dow Chemical Co. Med. Care Program,* 907 F.2d 554, 559 (5th Cir.1990).

 Finally, the plan states, "Accordingly, the management and control of the operation and administration of claim procedures under the Plan, including the review and payment or denial of claims and the provision of full and fair review of claim denial pursuant to Section 503 of the Act, shall be vested in the carrier." The use of the introductory word "accordingly" indicates that this last statement is a recapitulation and elaboration of the first two. The elaborating language adds nothing helpful to MetLife. It states that MetLife is to have "management and control of the operation and administration of claim procedures," but this language merely addresses MetLife's procedures. It says nothing about the merits of MetLife's substantive claims decisions, and nothing about whether those decisions are discretionary. The language providing that MetLife will conduct "full and fair review" of claim denials is taken verbatim from ERISA and merely recites what MetLife is required to do by law. *See* 29 U.S.C. § 1133(2). Our case law makes clear that this language is not enough. Reciting the terms of ERISA cannot confer discretion because, as the Supreme Court held in *Firestone* and we repeated in *Kearney,* the statute presumes *de novo* review as the default position. *See Sandy v. Reliance Standard Life Ins. Co.,* 222 F.3d 1202, 1205–06 (9th Cir.2000).

Comparing MetLife's plan with those plans in which we have ruled that abuse of discretion review is appropriate supports our conclusion that deference is unwarranted here. Since we decided *Kearney,* we have published four ERISA opinions in which we held that plan language granted discretion to the plan administrator. Two of those opinions examined plans that specifically used the word "discretion" to describe the administrator's authority to award benefits, *see McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1107 (9th Cir.2000)

("[Plan Administrator has] sole discretion to interpret the terms of the Plan"); *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 n. 5 (9th Cir.1999) ("[Insurer] shall have the sole discretion to interpret the terms of the Plan and to determine eligibility for benefits."), and the third considered plan language that was similarly unmistakable. *See Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9th Cir.2001) ("The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision."). The fourth opinion concluded in a single sentence that the plan clearly conferred discretion. *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 (9th Cir.1999). The *Bendixen* panel's attention was not focused on the issue of the clarity of the plan's language, but rather on the separate issue of an asserted conflict of interest on the part of the plan administrator. *See id.* at 943–44. The panel reproduced the relevant plan language in a footnote, *see id.,* at 943 n. 1, but neither analyzed the language nor specified the statements that, in its view, conferred discretion. We therefore find it difficult to apply the holding in *Bendixen;* but whatever its meaning, we do not regard it as requiring us to hold that the language in this case unambiguously confers discretion on MetLife.

 In light of *Kearney* and subsequent cases in this circuit, we hold that the text of MetLife's disability plan does not unambiguously state that the plan administrator has discretionary authority to grant or deny benefits. We think it appropriate to insist, as we did in *Kearney,* that the text of a plan be unambiguous. If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so. It is not difficult to write, "The plan administrator has discretionary authority to grant or deny benefits under this plan." When the language of a plan is unambiguous, a company purchasing the plan, and employees evaluating what their employer

has purchased on their behalf, can clearly understand the scope of the authority the administrator has reserved for itself. As we wrote in *Sandy,* it is "easy enough" to confer discretion unambiguously "if plan sponsors, administrators, or fiduciaries want benefits decisions to be reviewed for abuse of discretion." 222 F.3d at 1206. Where they fail to do so, "in this circuit at least, they should expect *de novo* review." *Id.*

### III

The district court decided this case before we decided *Kearney.* Relying on pre-*Kearney* cases, it incorrectly concluded that the appropriate standard of review for MetLife's denial of benefits was abuse of discretion, and, under that standard, granted summary judgment to MetLife. However, the district court also stated that it would have granted summary judgment under a *de novo* standard of review. *See* 36 F.Supp.2d 1190, 1195 (C.D.Cal.1999).

We review the district court's grant of summary judgment based on its application of the *de novo* standard. To affirm, we must find that, viewing the evidence in the light most favorable to Ingram, there are no genuine issues of material fact on the question whether he was "totally disabled" within the meaning of his disability policy. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000).

■ According to the definition that MetLife sent to the reviewing doctors, "total disability" means:

> For the first 24 months ... the employee must be unable to perform his or her regular occupation. After 24 months of receiving Long Term Disability Benefits, disability means complete inability to perform any job for which an employee is reasonably fitted by education, training or experience.[1]

Ingram has presented more than a "mere scintilla" of evidence to support his claim that his disability satisfies this definition,

*see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and we conclude that summary judgment should not have been granted.

■ Ingram offered multiple reports from his treating physician (Dr. Kwako) and a lengthy report from his psychologist (Dr. Bastien) that state in unqualified language that he is totally disabled. For its part, MetLife obtained three reports that reached the opposite conclusion. The district court granted summary judgment for MetLife by weighing these conflicting reports. *See, e.g.,* 36 F.Supp.2d at 1193 ("[T]he Porter Report convincingly refuted every medical explanation ever offered by Dr. Kwako for Ingram's reported subjective symptoms."). On summary judgment, the proper task is not to weigh conflicting evidence, but rather to ask whether the non-moving party has produced sufficient evidence to permit the fact finder to hold in his favor. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of matter...").

### IV

■ We reverse and remand for further proceedings consistent with *Kearney.* We recognize that such proceedings, if confined entirely to the existing record, would be little more than a formality. Because there is no right to a jury trial in ERISA cases, *see Thomas v. Oregon Fruit Prods. Co.,* 228 F.3d 991, 996–97 (9th Cir. 2000), the case will go back for a bench trial before the district judge who has already made clear his view of the evidence. If the record on remand is limited to the administrative record, we have no doubt that the district court would take the same view again.

■ Under *Kearney,* however, a remand is potentially more than a formality.

[1]. Although the plan itself defines "total disability" somewhat differently, both parties rely on the definition sent to Ingram's doctors. We do not believe that there is a material difference in the definitions.

At a bench trial in an ERISA benefits case, a claimant may seek to introduce evidence that is not already in the record. The district judge should admit additional evidence if "circumstances clearly establish that [it] is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 944 (9th Cir.1995) (quoting *Quesinberry v. Life Ins. Co. of North Am.,* 987 F.2d 1017, 1025 (4th Cir.1993) (en banc)). Ingram has indicated that he believes he has such evidence. We therefore remand to allow Ingram the opportunity to persuade the district judge that his additional evidence should be admitted, and that, if it is combined with evidence already in the record, he should prevail.

REVERSED and REMANDED.