Maria I. LAWLESS, Plaintiff,

v.

NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, et al., Defendants

No. 04–1732 MMC.

United States District Court, N.D. California.

Jan. 5, 2005.

Julian M. Baum, Baum & Weems, Novato, CA, Robert C. Weems, Baum & Weems, San Anselmo, CA, for Plaintiff.

Eugenia S. Chern, Robert D. Phillips, Jr., Linda B. Oliver, Fleming & Phillips LLP, Walnut Creek, CA, for Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; VACATING HEARING

CHESNEY, District Judge.

Before the Court is plaintiff Maria Lawless's motion for judgment by the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, and defendants'[1] motion for summary judgment, pursuant to Rule 56. Having considered the papers filed in support of and in opposition to the motions, the Court deems the matters suitable for decision on the papers, VACATES the hearing scheduled for January 7, 2004, and rules as follows.

### BACKGROUND[2]

On May 31, 2001, plaintiff, an attorney, filed with defendants a claim for disability

---

1. Defendants are Northwestern Mutual Life Insurance Company and Evans, Latham, Harris & Campisi Long Term Disability Plan.

2. The following facts are taken from the Administrative Record, which is attached to the Declaration of Doralyn Leeper, filed December 6, 2004.

benefits under an employee benefits plan available through her employer. (*See* Administrative Record ("AR") 123–24.)

The plan provides for disability benefits in the event a claimant, "as a result of Sickness, Accidental Bodily Injury or Pregnancy, [is] unable to perform with reasonable continuity the Material Duties of [her] Own Occupation." (*See* AR at 45.) Under the plan, benefits are payable beginning after the "91st day of Disability in the first 105 days after [the claimant] become[s] Disabled." (*See* AR 52.) The plan includes various "exclusions and limitations," (*see* AR 38–39), including the limitation that a claimant is not entitled to benefits unless she is "under the ongoing care of a Physician or Practitioner during [the] disability," (*see* AR 38).

In her claim, plaintiff stated that, as of March 29, 2001, she became unable to work because of an illness, which she described as "stress— increasing over past year + depression—severe." (*See* AR 124.) Plaintiff also stated that she had been hospitalized for that illness from March 19, 2001 through March 23, 2001. (*See id.*) In response to the question, "How does your disability prevent you from working?," plaintiff answered, "Unable to concentrate—episodes of crying uncontrollably—unable to process assignment, breaking down." (*See id.*) Defendants thereafter requested plaintiff's medical records and other information concerning plaintiff's condition. (*See, e.g.,* AR 132, 147, 149.) [3]

Defendant received from plaintiff's treating physician, John Melbourne McGraw, M.D. ("Dr.McGraw"),[4] an Attending Physicians Statement form dated May 24, 2001, wherein Dr. McGraw provided the opinion that plaintiff was "very

impaired" in the category of "concentration, cognition," and was either "very impaired" or had "no useful functioning" in the category of "adaptation to stress." (*See* AR 130.) In response to a question asking for the attending physician's "view of the likelihood of return to work," Dr. McGraw wrote: "Pt. [patient] left job in full time law practice. Pt. tried to return to work but was unsuccessful. Left permanently 4/4/01." (*See id.*) In that form, Dr. McGraw also described plaintiff's prognosis as "guarded," and, in response to the question, When do you anticipate the patient can return to work, Dr. McGraw checked a box to indicate, "Unable to determine." (*See id.*)

Dr. McGraw later provided defendants with other information, specifically, a July 1998 psychiatric consultative report he had prepared after first examining plaintiff, (*see* AR 160–63), copies of his progress notes, the first of which is dated in July 2000 and the last of which is dated June 18, 2001, (*see* AR 193–248), plaintiff's prescription history, dating from July 12, 2000 to June 21, 2001, (*see* AR 165–180, 183–192), and a copy of an "itinerary" for a trip that plaintiff and her minor son took to Europe from June 19, 2001 to September 1, 2001, (*see* AR 151, 250–51).

Additionally, Dr. McGraw, on October 5, 2001, provided defendants with a completed assessment form, in which, in response to the question, "Do you find the patient to be behaviorally or cognitively impaired? If so, what is the severity," he stated, "At the time pt. left work she was unable to function in the workplace"; (*see* AR 254), and in response to the question, "Based on any psychological test results and in your experience, do you find the patient to be

---

**3.** Defendants also requested, and received, work history and salary information from plaintiff and from plaintiff's former employer. (*See,* e.g., AR 125–27, 133–35.)

**4.** Dr. McGraw is a psychiatrist. (*See* AR 130.)

functionally impaired? If so, what is the severity?," he stated, "Emotionally was unable to function in workplace at the time she left," (*see id.*).

On October 16, 2001, defendants forwarded the file to consulting physician Carla G. Dorsey, M.D. ("Dr.Dorsey"), a psychiatrist, with instructions to review the "medical records" therein, and to answer two questions: (1) "Is there medical documentation to support a medical condition of a severity to preclude [plaintiff's] ability to perform the material duties of her occupation as an attorney on a reasonable continuous basis?"; and (2) "If so, what limits her ability to work as an attorney and for what period of time?" (*See* AR 277.)

On November 1, 2001, Dr. Dorsey submitted her report to defendants, and, after discussing the evidence in the file, answered the first question posed to her, as follows:

It does appear that for approximately two months between 3/19/01 (her admission for acute alcohol detox) and approximately 5/14/01 she was significantly limited and disabled on the basis of probably co-occurring depression and alcohol abuse. It would also be reasonable to expect a two month period of time to be adequate to respond to a new medication change (Effexor to Celexa) which was instituted on 3/19/01. However, from 5/14 on it appears that she is restabilizing which would fit into the time frame of a recovery from this sort of problem. In addition, it appears that she is functional enough to travel extensively in Europe throughout the summer of 2001 which would not argue for ongoing limitations and restrictions due to depression or alcohol abuse at any a time after 5/14/2001.

Of note as well, we have GAFs from Dr. McGraw of 40 on 7/31/98 despite the fact that she was working full-time for at least another 2½ years following that date despite the seemingly low GAF. Dr. McGraw also gives a GAF of 65 in 6/2000, a GAF of 35 in 2/2001 and a GAF of 45 in 9/2001. Thus, it appears that this patient has struggled chronically with symptoms of dysthymia and alcohol use but that these have not always been disabling to the point of her being unable to perform her occupation.

(*See* AR 281–82.)

Dr. Dorsey answered the second question posed to her, as follows:

Again, I think a two month period of time between 3/19/01 and 5/14/01 would be reasonable to expect her limitations and restrictions due to a chronic dysthymia and concurrent alcohol abuse in early remission to be significant enough to prevent her from performing her own occupation. However, again of note, she apparently has had a significant psychiatric disturbance in the past including a GAF of 40 in July of 1998 and was able to function adequately during that time. I don't see any medical documentation that would support ongoing limitations and restrictions at a period of time after 5/14/01 and this would also be a reasonable period to expect the recovery from an alcohol relapse as well as the exacerbation from a dysthymia even if it were a[s] serious as a major depressive disorder. Of note, Dr. McGraw does not change her treatment plan in any way according to the notes that I was able to decipher following her discharge from detox 3/23/01.

(*See* AR 281–82.)

On November 9, 2001, defendants denied plaintiff's claim, stating, "[W]e have no medical evidence to support that your condition precluded your ability to perform your own occupation as an attorney for a period of more than 90–days." (*See* AR 286.) In support of this finding, defen-

dants quoted the above-referenced findings made by Dr. Dorsey in her report to defendants.[5] (*See id.*)

On January 11, 2002, plaintiff requested review of the denial. (*See* AR 382–84.) In support of her request, plaintiff provided additional medical records corresponding to care plaintiff received "from MPI treatment center in Oakland for the period from October 1, 2001 through January 3, 2002." (*See* AR 382.) Plaintiff also addressed Dr. Dorsey's comments concerning the trip to Europe by stating that she "was in absolutely no condition to perform as an attorney at the time of [the] trip" and that she "spoke with Dr. McGraw regularly throughout [her] trip and even felt very suicidal during part of [her] stay." (*See* AR 383.)

On January 16, 2002, defendants notified plaintiff that although the new medical records "clearly show[ed] [plaintiff was] disabled due to a medical condition as of October 2001," the issue of "whether this additional medical documentation support[ed][the] claim for disability back to February or March, 2001, when [plaintiff was] last insured, remains unclear." (*See* AR 386.) Consequently, defendants informed plaintiff they were again referring the matter to their psychiatric physician consultant, and advised plaintiff to provide any additional medical documentation available. (*See id.*)

On February 7, 2002, defendants again referred the claim to Dr. Dorsey. (*See* AR 396.) In this second referral to Dr. Dorsey, defendants noted that Dr. Dorsey had previously concluded "disability was sup-

ported for the period of 3–19–01 to 5–14–01," pointed out that new evidence submitted by plaintiff appeared to show that plaintiff was disabled in October 2001, (*see id.*), and asked Dr. Dorsey, "Is there medical evidence to support a continuous period of disability for May 14, 2001 to October 2001?" (*See id.*)

After defendants had referred the file to Dr. Dorsey, defendants received from Dr. McGraw, and thereafter forwarded to Dr. Dorsey, a letter, in narrative form, dated February 4, 2002, in which Dr. McGraw discussed how he first began working with plaintiff in July 1998, set forth the reasons for her March 2001 hospitalization, and disclosed the explanation plaintiff had provided to him for taking the European trip.[6] (*See* AR 416–17, 427–30.) In that narrative, Dr. McGraw also reported that while plaintiff was in Europe, he had phone contact with her "several times" and that such calls were "supportive in nature." (*See* AR 416.) Dr. McGraw further stated that after plaintiff had returned to California, she had reentered a treatment facility, had "done significant psychological work," and was taking prescription drugs. (*See id.*) Finally, Dr. McGraw provided the opinion that "only now is [plaintiff] in a good enough mental state to attempt to return to the workplace." (*See* AR 416–17.)

On February 21, 2002, Dr. Dorsey submitted her report to defendants, and, after discussing the evidence in the file, answered the question posed to her, as follows:

---

5. Defendants, in quoting Dr. Dorsey's findings in the denial letter, erroneously referred to the GAF given by Dr. McGraw in February 2001 as "31," rather than "35" as Dr. Dorsey had reported to defendants. (*Compare* AR 281, *with* AR 286.) Also, in what appears to be a second typographical error, the denial letter did not fully set forth the first paragraph of Dr. Dorsey's answer to the first

question posed to her by defendants. (*Compare* AR 281, *with* AR 286.)

6. According to Dr. McGraw, plaintiff "made the decision to take a leave from her legal practice and seek out the support of her friends in Europe, who, in her mind, were more supportive than was her family." (*See* AR 416–17.)

I do not find any evidence that would support disability from a psychiatric or a substance abuse problem between 5/14/2001 and 10/2001. Essentially, the patient was not in active treatment during that time. She was vacationing and traveling in Europe with some extensive moving around and interacting with different people and cultures during that time. All of this would indicate the absence of psychiatric disability to an extent that would preclude her from functioning in her occupation. However, it appears that she did have an alcohol relapse in late October 2001 (10/30/2001 according to Summit Medical Center). Therefore there may be some evidence for short-term impairment due to alcohol relapse between 11/7/2001 and 12/5/2001 (this is the period in which she first enrolled in outpatient day treatment for the alcohol issue and it also includes the period in which she was in inpatient detoxification). Nowhere in any of the alcohol treatment notes is there any evidence for sufficient depressive symptomatology that would on its own render her limited or restricted from working. It also appears that after 1/3/2002 the patient is discharged from any alcohol treatment (except for self-help groups like AA), and is discharged back to outpatient care from Dr. McGraw.

Without any other substantiation, I cannot support Dr. McGraw's opinion that only as of 2/4/2002 is the patient stable enough to return to the workplace (except possibly during the aforementioned period of 11/7/2001 to 12/5/2001).

(*See* AR 428–30.)

On February 27, 2002, defendants informed plaintiff that, after reviewing the file, defendants were adhering to their decision to deny plaintiff's claim. (*See* AR 434–35.) Specifically, defendants stated, "[W]e do not find medical documentation to support continuous disability that would have extend [sic] for a period of more than 90–days following the date you ceased work," and, "information in your file also documents disability for a period of less than 90 days beginning November 7, 2001 and extending through December 5, 2001." [7] (*See* AR 434.) In support of this decision, defendants quoted the above-referenced findings made by Dr. Dorsey in her report to defendants. (*See* AR 435.) Finally, defendants stated they would refer the file to their "Quality Assurance Unit for the one time administrative review allowed by the terms of [the] group policy." (*See* AR 434.)

On June 11, 2002, defendants notified plaintiff that the "Quality Assurance Unit" had completed its administrative review and had found that "the decision to deny [the] claim is reasonable and will be upheld." (*See* AR 443.) Defendants, in explaining the basis for the determination upholding the decision, stated that "[t]here is no documentation ... that [plaintiff] sustained cognitive impairment for a period exceeding 90 days." (*See* AR 444.) Defendants also stated as follows:

Once you received an adequate period to stabilize after your hospitalization in March 2001, it is reasonable that you could have returned to work by mid-May 2001. Dr. McGraw did not significantly alter your treatment course after your March 2001 hospitalization. Your international travel itinerary for the period from June 19, 2001 through September 1, 2001, is consistent with per-

---

7. With respect to the period "beginning November 7, 2001 and extending through December 5, 2001," defendants also noted that plaintiff's disability insurance "ended on April 4, 2001," and thus defendants were "unable to provide benefits for any period of disability that may have begun in November 2001." (*See id.*)

forming transferable skills requiring good cognitive functioning. Chaperoning a minor child on international travel over a several month period of time is consistent with [the] decision that by mid-May 2001, and certainly as of June 19, 2001, you had recovered from your March 2001 alcohol relapse.

(*See id.*)

On March 9, 2004, plaintiff, through counsel, requested that defendants reconsider the denial of her claim, which claim plaintiff described as "for a discrete period of less than one year, from March 2001 through February 2002." [8] (*See* AR 468.) Plaintiff submitted, with the request, a new opinion provided by her treating physician, Dr. McGraw, as well as the opinion of an examining psychiatrist, Thomas B. Lewis, M.D. ("Dr.Lewis"),[9] both of whom opined that after plaintiff first became disabled, she remained disabled until February 2002. (*See* AR 455, 463.) Both Dr. McGraw and Dr. Lewis also offered the opinion that plaintiff's trip to Europe did not undermine her claim that she was unable to work as an attorney during that period of time. (*See* AR 454–55, 463–64.)

On March 15, 2004, defendants notified plaintiff that they were forwarding her file for review to "another physician consultant board-certified in psychiatry," (*see* AR 470), and thereafter referred the file to Esther Gwinnell, M.D. ("Dr.Gwinnell"), (*see* AR 469, 474). In the referral to Dr. Gwinnell, defendants requested that she review the entire file, including the new opinions from Dr. McGraw and Dr. Lewis. (*See* AR 469.) In particular, defendants requested that Dr. Gwinnell advise them whether plaintiff had a condition that precluded her from "performing higher-level cognitive functioning (such as an attorney)

on a reasonably continuous basis," and, if so, "for what period of time." (*See id.*)

On April 14, 2004, Dr. Gwinnell submitted her report to defendants, and, after discussing the evidence in the file, answered the above-referenced questions, as follows:

The documentation in the claim file supports the presence of significant alcohol abuse and depression from the cease work date; probably the date that should be used is that of 3/19/01, with [plaintiff's] admission to detox. The information in the file documents, per Dr. McGraw's progress notes, a general improvement in [plaintiff's] psychiatric status with her maintaining sobriety and the resolution of suicidal ideation by approximately mid May 2001. Her decision to go to Europe for an extended period of time and not be involved in psychotherapy does support the presence of improvement.

The dispute about whether or not an extended trip to Europe is equivalent to having achieved psychiatric baseline or the ability to return to work as an attorney does not seem to me to be a useful one. Rather, the documentation from June 2001, the only concurrently maintained documentation that has been available to this date of 4/14/04, supports that [plaintiff] was improving. Her self-report of having had difficulties in Europe is not documented by anyone, except [plaintiff's] self-report. There is no documentation of ongoing medical care after June 2001, although Dr. McGraw apparently has continued to see [plaintiff]. Nonetheless, no additional information has been submitted and, therefore, the documentation,

---

8. Plaintiff, in a letter to defendant dated February 12, 2002, stated that "only recently" had she been able to work. (*See* AR 407.)

9. Dr. Lewis examined plaintiff on November 13, 2003 and reviewed her medical records before providing his opinion. (*See* AR 462.)

based on concurrently maintained progress notes, ends effectively June 2001 with improvement, and [plaintiff] then taking an extended trip to Europe with a complicated itinerary and apparently "some phone calls" with primarily supportive content and no documentation. The additional information supports the occurrence of an alcohol relapse and re-admission to detox in October 2001. This does suggest a period of time of alcohol usage preceding that, and then the subsequent admission to inpatient and intensive outpatient care supports the presence of alcohol abuse of such severity, and treatment for that, which would reasonably prevent [plaintiff] from working from the date of the second detox admit, 11/7/2001, following which she was referred to and admitted to inpatient and continued to 1/2/2002. The initial period of time that is documented by concurrently maintained medical information is from 3/19/01 to approximately 6/1/01.

Although there has been considerable discussion of whether or not the Europe trip represents significant improvement or return to ability to work as an attorney, the most significant part of this is that it does demonstrate an extended period of time for which no medical documentation is available. Dr. Lewis's evaluation, coming two years after [plaintiff] returned to work, is not helpful in assessing what happened from 6/1/2001 to 10/1/2001; it does not present additional information, but simply comes to different conclusions.

(*See* AR 475.)

On April 23, 2004, defendants advised plaintiff that, following Dr. Gwinnell's review of her file, they had "concluded that [the] decision to deny this claim was appropriate." (*See* AR 485–86.) Defendants reported to plaintiff that Dr. Gwinnell had determined that "medical documentation" supported plaintiff's claim that she was unable to perform as an attorney "for the periods of March 19, 2001 through approximately June 1, 2001 and again on November 7, 2001 through January 2, 2002," (*see* AR 486), but that Dr. Gwinnell "could find no documentation that [plaintiff] continued to receive ongoing care from Dr. McGraw or any other provider for the period of June 2001 through October 1, 2001," (*see* AR 485).[10] Defendants also informed plaintiff that defendants would refer the file to defendants' Quality Assurance Unit for further review. (*See* AR 485.)

On June 1, 2004, defendants notified plaintiff that the "Quality Assurance Unit" had completed its administrative review and concluded that "the previous decision to deny [the] claim was correct." (*See* AR 509.) In support of this determination, defendants stated, *inter alia*, that "[t]here is no medical documentation . . . that supports that [plaintiff] was either under the ongoing care of a Physician for a mental disorder or Disabled due to a medical disorder after June 1, 2001 until October 1, 2001, when she was treated for detoxification admission." (*See* AR 507.)

## DISCUSSION

Plaintiff alleges that defendants' denial of her claim for disability benefits constituted a violation of the Employee Retirement Income Security Act ("ERISA").

### A.  Standard of Review

The parties disagree as to whether the Court should review defendants' denial de novo or for abuse of discretion.

■ "Depending upon the language of an ERISA plan, a district court reviews a plan administrator's decision to deny benefits either de novo or for abuse of discre-

_____

10.  Defendants provided plaintiff with a copy of Dr. Gwinnell's report. (*See* AR 494.)

tion." *Ingram v. Martin Marietta Long Term Disability Income Plan,* 244 F.3d 1109, 1112 (9th Cir.2001). "The de novo standard is appropriate unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* (internal quotation and citation omitted). "The default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Id.* (internal quotation and citation omitted).

■ Here, defendants argue that the following language, found in the governing insurance policy, confers upon defendants the discretionary authority to determine a claimant's eligibility for benefits and to construe the terms of the plan:

> Except for those functions which the Policy specifically reserves to the Policyowner, the Company has full and exclusive authority to control and manage the Policy, to administer claims, and to interpret the Policy and resolve all questions arising in the administration, interpretation, and application of the Policy.
>
> The Company's authority includes, but is not limited to:
>
> * The right to resolve all matters when a review has been requested;
> * The right to establish and enforce rules and procedures for the admin-

istration of the Policy and any claim under it;

> * The right to determine:
>   (1) Your eligibility for insurance;
>   (2) Your entitlement to benefits;
>   (3) The amount of benefits payable to you;
>   (4) The sufficiency and the amount of information the Company may reasonably require to determine 1, 2, or 3 above.
>
> Subject to the review procedures of the Policy, any decision the Company makes in the exercise of the Company's authority is conclusive and binding.

(*See* AR 34.)

The Ninth Circuit has had occasion to consider whether the above-quoted language confers discretion, and has held such language "clearly confers discretion on [the plan administrator] to decide whether a claimant is disabled," and, consequently, that "the standard [of review] is abuse of discretion." *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 n. 1 (9th Cir.1999).[11]

Accordingly, the Court finds that the appropriate standard of review is abuse of discretion.[12]

## B.  Merits

■ The Ninth Circuit has held it is an abuse of discretion for ERISA plan admin-

---

**11.** The language of the policy analyzed in *Bendixen* is identical to the language of the instant policy, with the exception that the policy in *Bendixen* (1) used the phrase "Group Policy" instead of "Policy," and (2) used "we" instead the "the Company." *Compare id.* at 943 n. 1, *with* AR 33.

**12.** Plaintiff relies on *Ingram,* an opinion issued after *Bendixen,* and which analyzes policy language different from that at issue in *Bendixen.* *See Ingram,* 244 F.3d at 1112. In *Ingram,* the Ninth Circuit sought to compare

the language in the policy there at issue with policy language analyzed in previous Ninth Circuit opinions, including *Bendixen, see id.* at 1113, and "[found] it difficult to apply the holding in *Bendixen*" because, according to the court in *Ingram,* the court in *Bendixen* "neither analyzed the language nor specified the statements that, in its view, conferred discretion." *See id.* By contrast, in the instant case, it is not "difficult to apply the holding in *Bendixen,*" because the holding in *Bendixen,* as discussed above, pertains to the very language at issue herein.

istrators to "rel[y] on clearly erroneous findings of fact in making benefit determinations." *See Bendixen*, 185 F.3d at 944; *see, e.g., Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122–23 (9th Cir.1998) (holding plan administrator abused its discretion in finding plaintiff's disability was caused by "pre-existing condition" where such finding lacked "sufficient evidentiary basis"). Here, plaintiff argues that defendants' denial of her claim for benefits constituted an abuse of discretion because "[t]he medical records and the conclusions of both Dr. McGraw and Dr. Lewis in this case overwhelmingly contradict [defendants'] grounds for denying [plaintiff's] insurance benefits." (*See* Pl.'s Mot., filed December 3, 2004, at 18:27–28.)

Defendants have acknowledged that plaintiff offered sufficient evidence to show she was disabled, within the meaning of the policy, for the period of March 19, 2001 [13] through "approximately" June 1, 2001. (*See* AR 486.) Additionally, defendants have acknowledged that plaintiff offered sufficient evidence to show she was disabled from October 2001 through January 2, 2002. (*See* AR 386, 486). Defendants found, however, with respect to the period beginning approximately June 1, 2001, that plaintiff had not shown she was "either under the ongoing care of a Physician for a mental disorder or Disabled due to a mental disorder," (*see* AR 507),[14] and that because plaintiff was no longer insured under the policy as of April 4, 2001, any period of disability that began after April 4, 2001 would not be covered by the plan. (*See* AR 434.)[15]

In support of her argument that defendants abused their discretion, plaintiff relies on the reports of Dr. McGraw and Dr. Lewis that plaintiff submitted to defendant in March 2004. As noted, in each of those reports, the physician set forth his opinion that after plaintiff first became disabled, she remained disabled until February 2002. Rather than accepting those opinions, defendants accepted the contrary opinion of their consulting physician, Dr. Gwinnell, that the medical record does not support a finding that plaintiff was disabled from June 2001 to October 2001.

■ As the Supreme Court has explained, "[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians." *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Thus, defendants were not obligated to accept the above-referenced opinion proffered by Dr. McGraw, or the similar opinion offered by examining physician Dr. Lewis, in the absence of sufficient evidentiary support for those opinions. *Cf. id.* at 834, 123 S.Ct. 1965 (observing plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician").

■ Here, defendants found, in essence, based on Dr. Gwinnell's analysis of the medical evidence, that the above-referenced opinions offered by Dr. McGraw and Dr. Lewis were not sufficiently supported. In Dr. Gwinnell's opinion, as noted, the record did not contain sufficient documen-

---

**13.** As noted, plaintiff was hospitalized from March 19, 2001 through March 23, 2001. (*See* AR 124.)

**14.** As noted, under the terms of the plan, a claimant is not entitled to benefits until the 91st day following the onset of the disability, (*see* AR 52), and, to be entitled to benefits, the claimant must be under the "ongoing care" of a physician or practitioner during the period of disability, (*see* AR 38).

**15.** Plaintiff does not challenge the finding that plaintiff was no longer insured as of April 4, 2001.

tation to support a finding that plaintiff was disabled, within the meaning of the policy, from early June 2001 to October 2001. In support of this opinion, Dr. Gwinnell identified numerous shortcomings in the medical evidence offered by plaintiff in support of her claim. These deficiencies, as noted by Dr. Gwinnell, include, for example: (1) Dr. McGraw's May 2001 progress notes, specifically, his notes beginning May 15, 2001, which indicated to Dr. Gwinnell that plaintiff was at that time "doing better, with marked decrease in suicidal ideation"; (2) Dr. McGraw's failure to provide any progress notes beyond June 2001 for defendants' review; (3) Dr. McGraw's failure to provide any information concerning the phone calls plaintiff made to him while she was in Europe, other than to characterize the calls as being "supportive in nature"; and (4) the fact that Dr. Lewis's assessment was based on self-reporting by plaintiff after she had returned to work. (*See* AR 476–78.)

Dr. Gwinnell's opinion was not arbitrary, as she set forth the basis for her opinion in detail.[16] Nor can the Court conclude that Dr. Gwinnell's opinion lacked an evidentiary basis, given the following: (1) Dr. McGraw's progress notes, which are nonexistent after mid-June 2001, provide little to no information as to how plaintiff's conditions affected her ability to work as an attorney; (2) Dr. McGraw, in his narrative reports, discussed in detail plaintiff's condition in March and April 2001 (*see* AR 416–17, 464), but provided no details concerning plaintiff's condition thereafter, until the time she began treatment in October 2001, (*see* AR 416–17, 463–64); (3) Dr. McGraw never offered any information, other than his ultimate conclusion, as to plaintiff's mental condition for the period during which she was in Europe;[17] (4) Dr. McGraw, in a form he completed for defendants on or about October 5, 2001, did not provide a responsive answer to questions requesting information on the effect that plaintiff's conditions had on her ability to work at the time the form was completed, but, rather, responded by providing only information as to how plaintiff's conditions negatively affected her ability to work at the time she initially became unable to work, (*see* AR 254); and (5) Dr. Lewis's observation that travel in Europe does not require the skills necessary to work as an attorney, (*see* AR 454), is not responsive to the issue of whether plaintiff was precluded from functioning as an attorney.[18]

Although a fact-finder, on de novo review, might conclude that the opinions of-

16. Similarly, Dr. Dorsey, the consulting psychiatrist on whose opinion defendants initially relied, provided reports detailing the basis for her opinions, which were similar in nature to those of Dr. Gwinnell. Dr. Dorsey, however, did not have the benefit of all of the information made available to Dr. Gwinnell, as plaintiff provided defendants with additional medical documentation after Dr. Dorsey had completed her reports.

17. Dr. Gwinnell referred to plaintiff's itinerary for the trip as "complicated," (*see* AR 475), perhaps because the itinerary disclosed that plaintiff took a series of trips, by either air or train, to at least six or seven locations, (*see* AR 251).

18. Plaintiff characterizes defendants' denial in 2004 as being based on the mere fact that plaintiff went to Europe during the summer of 2001, and argues that such a finding is unwarranted. The record, however, does not indicate that the denial was based on the fact of the trip. As Dr. Gwinnell aptly pointed out to defendants, the primary significance of the trip, from an evidentiary standpoint, is not that plaintiff took the trip, but that there is no documentation as to plaintiff's ability or inability to work as an attorney during that period of time. The Court notes that such observation is equally true as to the period of time immediately following plaintiff's return to the United States, as the record does not refer to plaintiff's having received any care until after she had been back in the United States for approximately one month. (*See* AR 460–61.)

fered by Dr. McGraw and Dr. Lewis are sufficient to support plaintiff's claim, the Court finds that defendants' decision not to accept those opinions did not constitute an abuse of discretion. Defendants' decision was based on detailed findings made by Dr. Gwinnell, and plaintiff has not shown those findings were arbitrary or lacking in evidentiary support. In short, plaintiff has not identified a clearly erroneous finding of fact, nor has she shown that defendant arbitrarily refused to credit reliable evidence. *See, e.g., Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 879 (9th Cir.2004) (holding plan administrator, in accepting opinion of "reviewing physician" over opinion of plaintiff's treating physicians, did not abuse discretion, where reviewing physician's report included "serious reasons for his conclusions, and allowed for a reasonable independent judgment by [the plan administrator] in reliance on it").

## CONCLUSION

For the reasons expressed above:

1. Plaintiff's motion for judgment is hereby DENIED; and

2. Defendants' motion for summary judgment is hereby GRANTED.

The Clerk shall close the file and terminate Docket Nos. 22 and 27.

IT IS SO ORDERED.