344 F.3d 1029
 CITY OF SAINT PAUL, ALASKA, a municipal corporation, Plaintiff-Appellant,
v.
Donald EVANS, Secretary of The U.S. Department of Commerce; Conrad C. Lautenbacher, Jr., Administrator, National Oceanic and Atmospheric Administration; Tanadgusix Corporation, an Alaska corporation, Defendants-Appellees.
 No. 02-35958.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 14, 2003 — Anchorage, Alaska.
 Filed September 25, 2003.
 
 Stephen M. Truitt, Pepper Hamilton LLP, Washington, D.C., and Ronald L. Baird, Anchorage, Alaska, for appellant City of St. Paul.
 Douglas F. Strandberg, Friday Harbor, Washington, and Terrance A. Turner, Owens & Turner, Anchorage, Alaska, for appellee Tanadgusix Corporation.
 Appeal from the United States District Court for the District of Alaska; H. Russel Holland, Chief Judge, Presiding. D.C. No. CV-97-00181-HRH.
 Before: Harry Pregerson, William C. Canby, Jr., and M. Margaret McKeown, Circuit Judges.
 OPINION
 McKEOWN, Circuit Judge:
 
 
 1
 This case is the latest round in a long-simmering legal feud between an Alaska Native corporation and a municipality over ownership of land on St. Paul, one of the Pribilof Islands, located in the Bering Sea some 350 miles west of mainland Alaska. In 1988, following the filing of various federal and state lawsuits, the Tanadgusix Corporation ("TDX"), a Native corporation, and the City of St. Paul ("the City") reached a settlement of their respective land rights on the tiny island. The federal government approved that Settlement Agreement.
 
 
 2
 Over time the City chafed under the strict limits on its ability to make commercial use of its land and, eight years later, filed this lawsuit challenging the validity of the Agreement. In response to the lawsuit, TDX filed counterclaims in an effort to reaffirm the settlement. The City now argues that, in rushing to approve the Agreement, City officials violated the City's own conflict of interest ordinance and the Alaska Open Meetings Act. The City also seeks to void the Agreement.
 
 
 3
 The district court found that the City's claims were barred by the six-year statute of limitations that Alaska law imposes on lawsuits by municipalities. Nonetheless, the court permitted the City to raise the identical allegations as defenses to TDX's counterclaims, although it ultimately rejected those defenses on the merits.
 
 
 4
 We do not reach the merits of the counterclaims and defenses. Rather, because the City's affirmative defenses are likewise barred by the statute of limitations, we affirm on that ground. To hold otherwise would permit plaintiffs, through a sort of jurisdictional jujitsu, to evade the limitations statutes by bringing a time-barred declaratory judgment action, waiting for the defendant to assert its interests in the form of a counterclaim, and then raising the identical time-barred claims as defenses.
 
 BACKGROUND
 
 5
 The rocky, windswept Pribilof Islands were one of the reasons that the United States bought Alaska from Russia in 1867. The land transaction, labeled "Seward's Folly," came with a price tag of $7.6 million in gold. Despite Alaska's rich natural resources, the fur seal trade on the Pribilof Islands was the only viable commercial prospect of any significance. Earlier, the Russian government had moved Aleutian Island natives to the Pribilofs and put them to work slaughtering the fur seals that used the islands' beaches as a rookery.[1] The United States took over the fur seal trade and ownership of all land and property on the Pribilofs until the 1966 Fur Seal Act provided for the transfer of some property for municipal and individual purposes. Fur Seal Act of 1966, Pub.L. 89-702, 80 Stat. 1091 (later amended). Section 206 of the Act directed that land be set aside "for homesite, commercial or other purposes...."
 
 
 6
 The Aleuts lived primarily in two villages, St. Paul and St. George. In an effort to take advantage of the Fur Seal Act's municipal land transfer provisions, St. Paul, which had been organized as a tribal government, became a city under Alaska law in 1971. Meanwhile, landmark federal legislation intervened, throwing the intended land transfers into question and putting the establishment of a town site on hold.
 
 
 7
 The 1971 Alaska Native Claims Settlement Act ("ANCSA"), an intended global settlement of all Native Alaskan land claims, called for the creation of Native village corporations to receive land from the federal government for the purpose of economic development in Native communities. 43 U.S.C. § 1607; see Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1064-65 (9th Cir.1998) (explaining ANCSA's distribution of land and money to village corporations). Section 14(c)(3) of ANCSA required village corporations, in turn, to convey some of the lands they received under the Act to municipal corporations, such as the City, existing within the bounds of the land grant. 43 U.S.C. § 1613(c)(3). Ultimately, the Department of the Interior determined that ANCSA preempted the transfer provisions of the Fur Seal Act.
 
 
 8
 The land situation grew more complicated when, in 1983, Congress passed the Fur Seal Act Amendments, Pub.L. 98-129, 97 Stat. 838, which ended the fur seal trade and, in conjunction with ANCSA, provided for "an orderly transition from Federal management of the Pribilof Islands." 16 U.S.C. § 1165(d)(8). Although TDX had selected, pursuant to ANCSA, most of the land on St. Paul, the City was entitled to a reconveyance from TDX for certain municipal purposes. See 43 U.S.C. § 1613(c)(3).
 
 
 9
 As required by the amendments, the Secretary of Commerce[2] ("the Secretary") entered into a Transfer of Property Agreement ("TOPA") with TDX, the City, the State of Alaska, and the Aleut Community of St. Paul. See id. However, a dispute between TDX and the City had already started to erupt, causing delays in implementing the TOPA. The parties' disagreement centered on the amount of land TDX was required to reconvey to the City under 43 U.S.C. § 1613(c)(3) and the use restrictions that TDX could impose on the reconveyed land. In view of the conflict, before the United States would convey any land under the TOPA, the Secretary requested that TDX and the City agree on a land distribution arrangement.
 
 
 10
 Instead of reaching an agreement, this request prompted TDX to sue the Secretary and the City to compel the transfer of land pursuant to the various federal statutes. Soon after, TDX and the City began settlement negotiations. After a series of meetings between members of the St. Paul City Council and TDX representatives, the two sides reached a settlement that was ultimately approved by the City Council at a public meeting in early 1988. The Agreement called for the dismissal of TDX's lawsuit along with a related state case, and, among other things, set forth the distribution between TDX and the City of rights to federal land on St. Paul. The Secretary, through the NOAA, approved the Agreement.
 
 
 11
 The Agreement governed relations between the parties until late 1996, when the City challenged the validity of the Agreement in a suit filed against the Secretary — but not TDX — in federal district court in the District of Columbia. A month later, TDX filed its own action against the City and the federal defendants, the Secretary and the Administrator of the NOAA, in federal district court in Alaska. The City's case was later transferred to federal court in Alaska. After the City added TDX as a defendant in its lawsuit, the parties agreed to consolidate the cases, and TDX's action was dismissed without prejudice. TDX's original claims were then re-styled as counterclaims in the suit filed by the City.
 
 
 12
 In the consolidated action, the City sought a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Agreement was invalid. The first four counts, which figure into our analysis, alleged that the Agreement (1) violated a St. Paul city ordinance prohibiting conflicts of interest during voting;[3] (2) violated the Alaska Open Meetings Law;[4] (3) was contrary to public policies embodied in statutes and the common law; and (4) was unconscionable.[5] In response, TDX brought nine counterclaims seeking, among other things, a declaratory judgment that the Agreement was enforceable against the City and the federal defendants, and that the City had repudiated and breached the Agreement.[6]
 
 
 13
 In a series of orders, the district court disposed of the City's claims, concluding that the first four claims were barred by the six-year statute of limitations in Alaska for lawsuits by government entities. See Alaska Stat. § 09.10.120. The court reasoned that the City could have raised its claims about the invalidity of the Agreement "as soon as the settlement agreement was executed."
 
 
 14
 However, in later orders, the court took a different approach to the City's affirmative defenses to TDX's counterclaims. Although four of the City's affirmative defenses — the arguments now raised by the City on appeal — were identical to its affirmative claims, the district court reasoned that the statute of limitations did not apply to the defenses. The court then rejected the defenses on their merits.
 
 
 15
 The court entered a partial final judgment pursuant to Rule 54(b), granting TDX's request for declaratory relief that the Agreement was valid against both the City and the federal defendants, and that the City had repudiated and breached the Agreement. The City appeals from that judgment.
 
 DISCUSSION
 
 16
 The City does not appeal the dismissal of its declaratory judgment claims on statute of limitations grounds. Thus, the threshold issue is whether the six-year statute of limitations bars the City from asserting its claims in the form of affirmative defenses to TDX's counterclaims. We review the district court's summary judgment de novo, and may affirm on any ground supported by the record. See Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd. of Las Vegas, 257 F.3d 937, 941 (9th Cir.2001).
 
 
 17
 Our inquiry into the interplay between statutes of limitations and defenses is not a new one. The district court, like the City, relied on the maxim that a statute of limitations should be used only as a shield, not a sword. See In re Paul Potts Builders, Inc., 608 F.2d 1279, 1282 (9th Cir.1979) (citing 2 B. Witkin, California Procedure, Actions § 228 (2d ed.1970)). Indeed, courts generally allow defendants to raise defenses that, if raised as claims, would be time-barred. See United States v. Western Pac. R.R. Co., 352 U.S. 59, 72, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); see also Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548-49 (2d Cir.1963) (permitting company to seek a declaratory judgment of non-liability in response to government claim, even though the company's claim would be time-barred if it had sought "affirmative recovery"). Without this exception, potential plaintiffs could simply wait until all available defenses are time barred and then pounce on the helpless defendant. See Western Pac. R.R. Co., 352 U.S. at 71, 77 S.Ct. 161.
 
 
 18
 Three Supreme Court cases illustrate the application of the principle of the statute of limitations as a shield rather than a sword. In Bull v. United States, 295 U.S. 247, 261-62, 55 S.Ct. 695, 79 L.Ed. 1421 (1935), the Supreme Court permitted a time-barred defense of "equitable recoupment"[7] to a tax enforcement action by the United States. The Court allowed a taxpayer to seek the amount of an earlier overpayment arising out of the same transaction, even though "the statute of limitations had barred an independent suit against the Government" for the overpayment. 295 U.S. at 262, 55 S.Ct. 695. Equitable recoupment has been allowed by state courts as well, but it has always been recognized as a defense, not a claim. See Mark S. Franklin, Note, State Application of the Doctrine of Equitable Recoupment, 40 Brandeis L.J. 781, 788 (2002).
 
 
 19
 A later case, United States v. Dalm, 494 U.S. 596, 606, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990), underscores the difference between an independent suit and a defense or claim in response to a suit. A taxpayer filed a separate lawsuit seeking equitable recoupment against the government for an overpayment of gift taxes on the same transaction for which the government had sued the plaintiff for income tax deficiency. Id. Rejecting the assertion that the plaintiff's situation was no different than the defendant's in Bull, the Supreme Court declined to permit the taxpayer to assert equitable recoupment. Id. Although the difference between the taxpayer's role as defendant in one lawsuit and plaintiff in another was jurisdictional, the Court reasoned, "[a] distinction that has jurisdiction as its central concept is not meaningless." Id.
 
 
 20
 The Supreme Court also considered invocation of the time-bar defense in Western Pacific Railroad, 352 U.S. at 71-72, 77 S.Ct. 161. The railroad timely brought suit within six years to establish the scope and reasonableness of a tariff. At issue was whether the Government was barred under a two-year limitation from referring its defense of unreasonableness to the Interstate Commerce Commission. The Court held that the statute did not "operate[ ] to bar reference to the Commission of questions raised by way of defense" in a timely-filed suit. Id. at 71, 77 S.Ct. 161. Significantly, the Court emphasized the difference between seeking affirmative recovery and having "adjudicated questions raised by way of defense." Id. at 73, 77 S.Ct. 161.
 
 
 21
 Courts have also permitted time-barred claims to be raised as defenses outside the recoupment context. See, e.g., Northern Pac. Ry. Co. v. United States, 277 F.2d 615, 623 (10th Cir.1960) (permitting the railroad to assert the defense of mutual mistake against a quiet title action by the United States after the court had dismissed the railroad's counterclaim); but see Rybovich Boat Works, Inc. v. Atkins, 585 So.2d 270, 271-72 (Fla.1991) (holding that a counterclaim seeking delivery of property, rather than monetary recoupment, was time-barred because it would place "a cloud on the title of any real property that was the subject of a failed contract for purchase and sale.").
 
 
 22
 A common thread running through these cases is the emphasis on the respective roles of the parties in the litigation as a whole. It is important that the party asserting the defense is not, simultaneously or in parallel litigation, seeking affirmative recovery on an identical claim. Thus, whether affirmative defenses are exempt from statutes of limitations largely hinges on a realistic assessment of the parties' litigation posture.
 
 
 23
 In a related vein, our sister circuits have held that statutes of limitations and laches bar declaratory judgment claims seeking to establish a defense in anticipation of an action to enforce a contract or regulation. In other words, a plaintiff cannot engage in a subterfuge to characterize a claim as a defense in order to avoid a temporal bar. See, e.g., Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1488 (1983) (holding that laches barred a pre-enforcement declaratory judgment action alleging that a price regulation was invalid).
 
 
 24
 A Second Circuit case, 118 East 60th Owners, Inc. v. Bonner Properties, Inc., 677 F.2d 200, 203-04 (2d Cir.1982), is instructive. There, a group of property owners sought, among other things, rescission and modification of a ten-year-old lease agreement, alleging that the property company had inserted unfair and unconscionable terms into the lease. Id. at 202. Although the owners admitted that their claims for affirmative relief were time-barred, they sought a declaratory judgment that would entitle them to a setoff and defense against future claims by the company to enforce lease obligations. Id. Concluding that the "plaintiff is ... more of an aggressor than defendants" and that the "[d]efendants have done nothing concrete to change the basic relations between the parties as they have existed for over ten years," the Second Circuit rejected the owners' argument and held that New York's statute of limitations barred the declaratory judgment claims. Id. at 204; see also Rosette, Inc. v. United States, 141 F.3d 1394, 1397 (10th Cir.1998) (dismissing claim not filed within statute of limitations and noting that lawsuit was affirmative step to quiet title even though characterized as a defensive matter); Gilbert v. City of Cambridge, 932 F.2d 51, 58 (1st Cir. 1991) (holding that temporal bar cannot be sidestepped by asserting a defensive declaratory judgment claim); Clary v. Stack Steel & Supply Co., 611 P.2d 80, 83 (Alaska 1980) (dismissing, as barred by statute of limitations, plaintiff's affirmative claim that a contract be declared void because it was formed under duress).
 
 
 25
 Here, the City cannot escape the conclusion that it is the aggressor in this litigation. The City initiated the lawsuit and there is no question that the City "disturbed the equilibrium between the parties" by first challenging the validity of the Agreement in court. See 118 East 60th Owners, 677 F.2d at 205.
 
 
 26
 Statutes of limitations "are aimed at lawsuits, not at the consideration of particular issues in lawsuits...." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 416, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998). At bottom, this lawsuit boils down to the City's effort to invalidate the Agreement. TDX's counterclaims were filed in response to the City's claims, not as affirmative claims for relief. Indeed, the City's defenses to those counterclaims are mirror images of its time-barred claims. No matter what gloss the City puts on its defenses, they are simply time-barred claims masquerading as defenses and are likewise subject to the statute of limitations bar. In launching the current litigation, the City abandoned its right to seek solace in the status of a defendant. In the circumstance presented here, the City cannot hide behind the maxim applicable to defenses asserted in the normal course nor may it sidestep the temporal bar to its claims. See Duell v. United Bank of Pueblo, 892 P.2d 336, 340 (Colo.Ct.App. 1994) (holding that an exception in the limitation statute for compulsory counterclaims did not allow a "plaintiff, who has instituted litigation by asserting time-barred claims, to revive those same claims simply by re-pleading them as counterclaims in a reply to a defendant's counterclaim that is compulsory"); Hamilton v. Cunningham, 880 F.Supp. 1407, 1414 (D.Colo.1995) (finding "illogical and unsound" "the suggestion that a plaintiff in one action can `revive' his concededly stale claims by filing them as counterclaims in a parallel action brought by the defendant solely for the purpose of having those claims declared stale").[8]
 
 
 27
 We also observe that the City's attempt to circumvent the statute of limitations takes place in the context of a broad effort, mandated by federal statutes, to bring about a permanent resolution of land disputes on St. Paul. In enacting ANCSA, Congress envisioned that the settlement of land claims in Alaska "should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation...." 43 U.S.C. § 1601(b); see also City of Ketchikan v. Cape Fox Corp., 85 F.3d 1381, 1383 (9th Cir.1996) (describing ANCSA as a compromise in response to "conflicts among the federal government, the state of Alaska, Alaska Natives and non-Native settlers over ownership of Alaskan lands."). Similarly, the Fur Seal Act Amendments of 1983 sought "to ensure an orderly transition from Federal management of the Pribilof Islands." See Pub.L. 98-129, 97 Stat. 838; 16 U.S.C. § 1165(d)(8). The goal of settling all claims without litigation has proved elusive. Nevertheless, TDX and the City reached a settlement of their claims to land on St. Paul. It would thwart the purposes of that Agreement, ANCSA, and the Fur Seal Act Amendments, if land titles on St. Paul were encumbered by prospect of endless litigation, with no temporal restrictions, resulting from challenges to the validity of the Settlement Agreement. These important congressionally-mandated policies buttress our decision to apply the statute of limitations to the City's defenses. Because the City's defenses are time-barred, we affirm the district court's summary judgment in favor of TDX.
 
 
 28
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 For an extensive discussion of the history of the relationship between the federal government and Pribilof residents, see generally Dorothy Miriam Jones,A Century of Servitude: Pribilof Aleuts Under U.S. Rule (1981). See also Aleut Community of St. Paul Island v. United States, 202 Ct.Cl. 182, 480 F.2d 831 (1973).
 
 
 [2]
 The Commerce Department, through the National Oceanographic and Atmospheric Administration ("NOAA"), had administrative responsibility for the Pribilofs and still holds title to some of the land in the islands
 
 
 [3]
 St. Paul, Alaska, Ordinance 84-08 (Mar. 13, 1984)
 
 
 [4]
 Alaska Stat. § 44.62.310 (Michie 2002)
 
 
 [5]
 In other claims, the City alleged a breach of the Agreement by the TDX, as well as a breach of fiduciary duty and unlawful administrative delay by the Secretary. The City does not appeal the dismissal of these claims on summary judgment
 
 
 [6]
 Many of the counterclaims were contingent and sought various forms of relief in the event that the court ruled in favor of the City and declared the Agreement to be invalid. In any event, the district court's Rule 54(b) judgment granted only a declaratory judgment that the Agreement was valid and enforceable against the City and federal defendants, and that the City had breached the Agreement. The order did not dispose of the remaining counterclaims
 
 
 [7]
 Equitable recoupment is often used to describe a defendant's right to seek reduction of damages based on the amount of a related claimBlack's Law Dictionary 559 (7th ed. 1999).
 
 
 [8]
 Were we to adopt the City's position, defendants like TDX might also face the choice of either waiving compulsory counterclaims or giving up the right to assert the statute of limitations as a defenseSee Duell, 892 P.2d at 340.