356 F.3d 1067
 Nedra JOHNSON; Deborah Nelson; Michael Friend; Carol Larsen, Plaintiffs-Appellants,
v.
James BUCKLEY; Charles Carroll; Burt Chase; Ed De Garbolewski; John Sininger; Holly Williams, Defendants, and
W.L. Gore & Associates, Inc. Restated Assoc. Stock Ownership Plan, Defendant-Appellee.
 No. 02-17094.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 3, 2003.
 Filed January 28, 2004.
 
 COPYRIGHT MATERIAL OMITTED Susan Martin, Martin & Bonnett, P.L.L.C., Phoenix, AZ, for the plaintiffs-appellants.
 Charles F. Knapp, Faegre & Benson LLP, Minneapolis, MN, for the defendant-appellee.
 Paul W. Heiring, Faegre & Benson LLP, Minneapolis, MN, for the defendant-appellee.
 Appeal from the United States District Court for the District of Arizona, Mary H. Murguia, District Judge, Presiding. D.C. No. CV-99-01699-MHM.
 Before: SCHROEDER, Chief Judge, D.W. NELSON, and RYMER, Circuit Judges.
 D.W. NELSON, Senior Circuit Judge:
 
 
 1
 When W.L. Gore & Associates, Inc., (Gore) closed its Phoenix, Arizona, electronic parts plant in 1998, many of its employees lost their jobs before they qualified for an additional year of vesting and benefit accrual credit under Gore's stock ownership and pension benefit plan (Plan). Gore's Plan used the long-standing "elapsed-time method" to calculate vesting and benefit accrual. That method counts the period of time the employee is employed, and not the number of hours an employee has worked during a given twelve-month period.
 
 
 2
 Two classes of Gore's former Phoenix employees now appeal the final judgment of the district court granting defendants' motion for summary judgment. The five claims presented on appeal center on three arguments. The employees primarily assert that the elapsed-time regulation violates ERISA's vesting and benefit accrual requirements. Subsidiary to that claim, they allege that even if the regulation is lawful, Gore nonetheless violated it. Finally, they allege that Gore violated its own Plan when it interpreted the term "layoff" to mean a temporary absence and not a permanent loss of employment. Because the elapsed-time regulation is valid, and because Gore did not violate it or its own Plan, we affirm.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 In July 1998, Gore announced that it was closing its Phoenix plant. Gore repeatedly described to its employees, both in oral and written form, that the upcoming loss of employment was a "layoff." However, it also circulated a WARN notice to the affected employees, in accordance with 29 U.S.C. § 2102(a), stating that the Phoenix plant was closing and that "Due to the business relocation, your employment with Gore will be terminated, effective September 26, 1998." There is no dispute that the employees in this suit were in fact permanently terminated from their jobs at the Gore plant.
 
 
 4
 One of the employees who lost her job due to the plant closing, Nedra Johnson, filed a complaint with the committee that administered the Plan (Committee), seeking credit for an additional year of service. Johnson's benefits had not yet vested under the Plan because she had worked at Gore for more than four years, but less than five. Under the Plan, employees were required to work five years before they vested in the benefits. Each additional year of service, from April 1 to March 31, counted towards the accrual of benefits.
 
 
 5
 The Committee relied on Plan section 4.5.1 to deny Johnson's request. This section states that:
 
 
 6
 Your severance from Service will occur on the earlier of:
 
 
 7
 (1) The date on which you quit, retire, are discharged, or die; or
 
 
 8
 (2) The first anniversary of the first day of a period during which you remain absent from employment (with or without pay) for any other reason, such as your vacation, holiday, sickness, disability, leave of absence or layoff.
 
 
 9
 The letter denying Johnson's benefits explained that the term "layoff" refers to a temporary absence as opposed to a permanent severance with the company. The Committee determined that Johnson's termination was permanent and she was, therefore, not eligible for an additional year of credit under Plan section 4.5.1.
 
 
 10
 Johnson filed a complaint alleging violations of ERISA, 29 U.S.C. §§ 1001 to 1461 (1974), in September 1999. Motions for class certification soon followed. Johnson was named as the representative for Class A plaintiffs: former Gore employees seeking benefits even though they had less than five years of service. Deborah Nelson was named as the representative for Class B plaintiffs: former Gore employees who were already vested, but could not share in Gore's Plan contribution for the year because they lost their jobs prior to the last day of the Plan year.
 
 
 11
 On November 30, 2000, the district court denied employees' class certification motions without prejudice, and determined that the Committee's denial of benefits should be reviewed for abuse of discretion. Almost three months later, the employees moved to amend the complaint to add individual members of the Committee as defendants. The employees also sought to add counts for alleged violations of ERISA's disclosure, vesting, and benefit accrual requirements, a count for breach of fiduciary duty, and another count for participation in that breach by James Brown, legal counsel for the Plan. The court granted the employees' motion, but refused to add the fiduciary duty claims.
 
 
 12
 On August 21, 2001, both parties stipulated to a revised second amended complaint. This complaint withdrew Count I, under which the employees had alleged that Gore violated ERISA when it failed to credit class members who had already accumulated 1,000 hours of service in their last Plan year. The employees agreed to withdraw this count because of the potential for intra-class conflict. In other words, some members in Class A or Class B may not have worked 1,000 hours within the Plan year and would therefore not gain, and perhaps lose, credit. Count II, which alleged that Gore had violated the elapsed-time regulation, remained in the complaint.
 
 
 13
 After Count I was withdrawn, the parties stipulated to the class certification and the district court issued an order certifying both classes of plaintiffs. Shortly thereafter, both parties filed cross-motions for summary judgment. In addition, the employees filed a renewed motion on the standard of review, asking the court to review the Committee's denial of the employees' benefits claims de novo, and not for abuse of discretion. The latter motion was based on an e-mail to Brown that had not been previously disclosed in discovery. The employees alleged that the e-mail proves that the Committee members were influenced by a material conflict of interest, thereby meriting de novo review.
 
 
 14
 The e-mail at issue reflects a conversation that Holly Williams, a Committee member, had with outside counsel Robert Meyer. In the e-mail, Williams told Brown that Meyer had informed her that Plan section 4.5.1 was typical "Department of Labor language," and that "`leave of absence' and `layoff' are used when the person is expected to return to work." Furthermore, she conveyed that Meyer told her that "if we wanted to stretch it," the Committee could use "leave of absence" as a term code for the Gore employees who lost their jobs because of the closure of the Phoenix plant. Williams expressed in her e-mail to Brown that she was uncomfortable labeling the employees as being on a leave of absence because she wasn't sure how it would affect other benefits and whether non-vested employees would be treated differently than vested employees. She also expressed concern that if the non-vested and vested employees were treated differently, they might receive different benefits because the value of the stock could be higher or lower at the time of the distributions. She concluded by stating that she felt very uncomfortable stretching the definition of "layoff" and "leave of absence," and mentioned that she had not shared any of Meyer's advice with anyone else besides Brown.
 
 
 15
 The district court denied the employees' renewed motion on the applicable standard of review and granted Gore's motion for summary judgment.
 
 STANDARD OF REVIEW
 
 16
 We review the grant of summary judgment de novo. Alford v. DCH Found. Group Long-Term Disability Plan, 311 F.3d 955, 957 (9th Cir.2002). "We also review a district court's choice and application of the standard of review applicable to a claims decision in the ERISA context de novo." Id.
 
 DISCUSSION
 I. The Elapsed-Time Regulation
 
 17
 Generally, the elapsed-time regulation allows for the calculation of an employee's "statutory entitlement with respect to eligibility to participate, vesting and benefit accrual .... with reference to the total period of time which elapses while the employee is employed...." 26 C.F.R. § 1.410(a)-7(a)(1)(ii). Upon severance from employment, the employee is no longer capable of accruing time for either vesting or the accrual of benefits. The severance from service provision, which substantially mirrors Gore Plan section 4.5.1, states that: For purposes of this section, a "severance from service" shall occur on the earlier of —
 
 
 18
 (i) The date on which an employee quits, retires, is discharged or dies; or
 
 
 19
 (ii) The first anniversary of the first date of a period in which an employee remains absent from service (with or without pay) with the employer or employers maintaining the plan for any reason other than a quit, retirement, discharge or death, such as vacation, holiday, sickness, disability, leave of absence or layoff.
 
 
 20
 Id. at § 1.410(a)-7(b)(2)(i-ii).
 
 
 21
 The elapsed-time regulation was initially promulgated, in temporary form, by the Department of Labor in 1976. See 41 Fed.Reg. 56,484 (1976). In 1980, the Department of the Treasury, to whom some authority over ERISA had been transferred, promulgated the final elapsed-time regulation. See Swaida v. IBM Ret. Plan, 570 F.Supp. 482, 485 (S.D.N.Y.1983), aff'd, 728 F.2d 159 (2d Cir.1984) (per curiam). The regulation was a reflection of the manner in which vesting and benefit accrual for many private retirement benefit plans were already being calculated across the country. See id. at 489.
 
 
 22
 The elapsed-time regulation was promulgated at the same time as, and as an alternative to, the hours of service method, which credits service for vesting and benefit accrual if an employee works 1,000 hours within a twelve-month period. See 41 Fed.Reg. 56,471 to 56,480; 29 C.F.R. § 2530.200b-1 to b-3. The 1,000-hour method allows several equivalencies. See 29 C.F.R. § 2530.200b-3(c)-(f). These equivalencies provide employers with alternate methods for determining an employee's hours of service. Generally, they free the employer from keeping an actual tally of every hour worked and allow employers to derive an "hours worked" figure, for example, on the basis of an employee's days of employment, weeks of employment, or months of employment. See § 2530.200b-3(e)(1)(i-iv). Essentially, the equivalencies lessen the administrative burden for both employers and employees of maintaining compliance with the 1,000-hour method.
 
 
 23
 II. Does the Elapsed-Time Regulation Violate ERISA?
 
 
 24
 The employees argue that the elapsed-time regulation violates the minimum standard, the vesting, and the benefit accrual provisions of ERISA because it fails to require the counting of hours of service.[1] See 29 U.S.C. §§ 1052(a)(3)(A), 1053(b)(2)(A), 1054(b)(4)(A). Other courts have addressed the question of whether the elapsed-time method violates the vesting provisions of ERISA and have upheld the regulation. We agree with the Second Circuit in Swaida, the Seventh Circuit in Coleman v. Interco Inc. Divisions' Plans, 933 F.2d 550, 552 (7th Cir.1991), and the Eighth Circuit in Jefferson v. Vickers Inc., 102 F.3d 960, 964 (8th Cir.1996), and hold that the elapsed-time regulation does not violate ERISA.
 
 
 25
 In Swaida, various factors compelled the district court, whose opinion was unanimously adopted by the Second Circuit, to find that the elapsed-time regulation does not violate ERISA. See Swaida, 570 F.Supp. at 490. The district court emphasized the statutory goal of protecting the pension rights of employees, the need to offer an alternative to the administratively burdensome 1,000-hour method, and the authority Congress delegated to the Labor and Treasury Departments to issue regulations to clarify the terms "hour of service," see 29 U.S.C. §§ 1052(a)(3)(C), 1053(b)(2)(B), and "year of service," see 26 U.S.C. § 411(a)(5)(A). Swaida, 570 F.Supp. at 486-89. It also noted the broad authority of both the Secretary of Labor and the Secretary of the Treasury to promulgate regulations governing ERISA. Id. at 488.
 
 
 26
 The Seventh Circuit in Coleman was confronted with a claim similar to that in Swaida from an employee who quit before he was fully vested in his employer's plan. Coleman, 933 F.2d at 550. The employee argued that he should be credited with his final year of service because he had worked 1,000 hours. See id. at 551. The Seventh Circuit noted that the plan used the elapsed-time method and reasoned that if the regulation was valid, Coleman would lose. See id. at 552. The court emphasized the universal use of the elapsed-time method, and ultimately concluded that the regulation is valid. See id.
 
 
 27
 The other courts to address the issue have also upheld the elapsed-time regulation, see Jefferson, 102 F.3d at 964 (8th Cir.1996), or have specifically refrained from addressing the argument the employees advanced in the district court — that where the elapsed-time regulation does not operate as equitably as the 1,000-hour rule, it is unlawful. See Automated Packaging Sys. Inc. v. Comm'r, 70 T.C. 214, 224 n. 11, 1978 WL 3278 (1978).
 
 
 28
 In order to determine the validity of this regulation, we must first examine the statutory language, as well as any extrinsic evidence, to determine if "`Congress has not directly addressed the precise question at issue.'" Montana v. Clark, 749 F.2d 740, 745 (D.C.Cir.1985) (quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). If Congress has made an express delegation for the agency to fill a gap in the statutory scheme, we must affirm the agency's construction unless it is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844, 104 S.Ct. 2778.
 
 
 29
 The debated provisions of ERISA show that Congress delegated authority to the Secretary to define the term "hour of service." 29 U.S.C. § 1052(a)(3)(C). The statute also indicates that the term "year of service," for vesting purposes, means a twelve-month period during which the participant has completed 1,000-hours of service. 29 U.S.C. § 1052(a)(3)(A); 29 U.S.C. § 1053(b)(2)(A). Lastly, the statute delegates authority to the Secretary to define, on any reasonable and consistent basis, the term "year of participation" for benefit accrual purposes. 29 U.S.C. § 1054(b)(4)(A).
 
 
 30
 Central to the employees' argument is the claim that the plain language of 29 U.S.C. § 1052(a)(3)(A) and § 1053(b)(2)(A) should govern, limiting all benefits plans to the 1,000-hour method. This position is weakened, however, by the delegations of authority granted in §§ 1052(a)(3)(C) and 1054(b)(4)(A). These closely related provisions make the plain language of §§ 1052(a)(3)(A) and 1053(b)(2)(A) ambiguous, and defeat the argument "that the words of the statute, without more, embody Congress' intent." Clark, 749 F.2d at 749. In other words, it is clear under 29 U.S.C. § 1054(b)(4)(A) that Congress intended the Secretary to determine how to measure a "year of participation" for purposes of benefit accrual. It is difficult to conceive of a scheme that would limit the 1,000-hour method for vesting purposes, but allow other "reasonable and consistent" methods for purposes of accrual. These conflicting commands require us to look beyond the employees' "plain meaning" argument. See id. at 746 ("The literal words of the statute are presumptively conclusive of legislative intent, but that presumption may be defeated by contrary indications of intent also evident on the face of the statute.").
 
 
 31
 As the parties documented, the legislative intent is not conclusive on the specific issue at hand. See also Swaida, 570 F.Supp. at 486 (finding that the 1000-hour provision was not discussed extensively in either the Senate or House of Representatives). It is beyond dispute, however, that one of the primary goals of ERISA is to reduce the "burden of compliance with [ERISA] provisions by plan administrators, employers, and participants and beneficiaries." 29 U.S.C. § 1204(a). Eliminating the requirement of counting every hour an employee works furthers this goal. In light of this clear statement of congressional purpose, and Congress's express delegation to define the terms "hour of service" and "year of participation," it cannot be said that Congress "expressly foreclose[d] the construction embodied in the challenged regulation." Clark, 749 F.2d at 746.
 
 
 32
 Therefore, the court must defer to the agency's regulation unless it is arbitrary, capricious, or manifestly contrary to the statute. The regulation is neither arbitrary nor capricious because it is well within the Secretary's compass to determine, on policy grounds, that the elapsed-time method, on the whole, is "reasonable and consistent with" the 1,000-hour method. In fact, the elapsed-time method is often more generous to employees, as the employees here implicitly conceded by withdrawing Count I on the grounds that certain class members would not gain, and perhaps lose, vesting and benefit accrual credit under the 1,000-hour regime. Given the Secretary's authority to define the term "year of participation," the employees' argument that the elapsed-time method is invalid because it is not as equitable as the 1,000-hour rule in every application amounts to an impermissible challenge to the apparent agency decision that the elapsed-time rule is generally reasonable and consistent. See Chevron, 467 U.S. at 866, 104 S.Ct. 2778.
 
 
 33
 Nor is the elapsed-time regulation contrary to the statute, as the employees contend, solely because it transforms the "hour of service" requirement into a "period of time" requirement. The elapsed-time regulation is closely related to the equivalencies listed in 29 C.F.R. § 2530.200b-3(c)-(f). Although the elapsed-time regulation is not included as one of the equivalencies, it was promulgated at the same time and shares the same spirit of allowing employers to avoid actually counting every hour of an employee's service.
 
 
 34
 Therefore, the express delegations granted to the Secretary to define "hour of service" and "year of participation," coupled with the legislative goal of minimizing the burden of administering benefit plans, lead to the conclusion that the elapsed-time regulation is not arbitrary, capricious, or manifestly contrary to the governing statutory provisions.
 
 
 35
 III. Did Gore Violate the Elapsed-Time Regulation?
 
 
 36
 The employees maintain that even if the elapsed-time regulation is lawful, Gore violated it when it immediately severed their service under 26 C.F.R. § 1.410(a)-7(b)(2)(i), and failed to credit them with an additional year of service under § 1.410(a)-7(b)(2)(ii). We disagree.
 
 
 37
 We review the district court's interpretation of the regulation de novo. Student Loan Fund of Idaho, Inc. v. United States Dept. of Educ., 272 F.3d 1155, 1165 (9th Cir.2001) (amended by 289 F.3d 599 (2002)). First, the district court held that the employees' argument that Gore's application of the elapsed-time regulation had to be "as equitable as" the 1,000 hour rule ignored the language of the regulation itself. In light of the discussion above, it is not necessary to return to this argument. Second, and more importantly, the court held that the employees misconstrued the meaning of the term "discharged" in section 1.410(a)-7(b)(2)(i), and "layoff" in section 1.410(a)-7(b)(2)(ii). The district court reasoned that because the term "layoff" is described as an "absence" in the severance from service provision, it connotes a temporary loss of employment. The court therefore held that Gore's refusal to credit the employees with service under the Plan did not violate ERISA's elapsed-time regulations since the employees permanently lost their jobs.
 
 
 38
 On appeal, the employees argue that the district court erred because the word "layoff" encompasses both permanent and temporary losses of employment. However, the structure of the severance from service provision defeats their interpretation that the term "layoff" includes both permanent and temporary losses of employment. An employee's statutory entitlement "is determined generally with reference to the total period of time which elapses while the employee is employed (i.e., while the employment relationship still exists) ...." 26 C.F.R. § 1.410(a)-7(a)(1)(ii). Under the first section of the severance from service provision, an employer shall cease crediting an employee's service upon a permanent loss of employment. 26 C.F.R. § 1.410(a)-7(b)(2)(i). In contrast, under the temporary absences of vacation, holiday, sickness, disability, leave of absence, and "layoff," the employment relationship has not terminated. Employers are obligated therefore to continue to credit service during those absences. In order to protect the employer, however, the regulation allows an employer to cease crediting service after one year of such an absence. See 26 C.F.R. § 1.410(a)-7(b)(2)(ii).
 
 
 39
 Section 1.410(a)-7(b)(2)(i) therefore governs permanent losses of employment, while section 1.410(a)-7(b)(2)(ii) governs temporary absences. The employees' analysis ignores that structure. To interpret a "layoff" in section 1.410(a)-7(b)(2)(ii) as permanent would give it the same effect as a "discharge" in section 1.410(a)-7(b)(2)(i) — both end the employment relationship. Such a construction would not only rob the word "discharge" of meaning, it would ignore the regulatory dictate that an employee can no longer accrue credit upon the cessation of the employment relationship. We conclude, therefore, that the term "layoff" in the elapsed-time regulation encompasses only a temporary loss of employment.
 
 
 40
 IV. Did Gore Violate the Plan When it Denied the Employees' Benefits Claims?
 
 
 41
 The employees also challenge Gore's interpretation of its own severance from service Plan language. They claim that Gore violated Plan section 4.5.1 when it denied the employees an additional year of vesting and benefit accrual credit because Gore should have construed the term "layoff" to include both temporary and permanent losses of employment.
 
 
 42
 Typically, the denial of benefits by a plan will be reviewed de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where, however, the plan unambiguously confers the administrator with discretionary authority to determine benefits eligibility, the denial will be reviewed for abuse of discretion. See id.; McDaniel v. Chevron Corp., 203 F.3d 1099, 1107 (9th Cir. 2000).
 
 
 43
 Contrary to the district court's conclusion, the relevant Plan language here does not unambiguously confer discretionary authority to the Committee to determine benefits eligibility.[2] As in Ingram v. Martin Marietta Long Term Disability Income Plan, 244 F.3d 1109 (9th Cir.2001), the Plan language "says nothing about the merits of [Gore's] substantive claims decisions, and nothing about whether those decisions are discretionary." Id. at 1113. While the language that the decisions of the Committee will be final weighs somewhat against an application of the de novo standard of review, the relevant language here does not measure up to the more unambiguous grants of discretion this court has upheld before. See McDaniel, 203 F.3d at 1107; Friedrich v. Intel Corp., 181 F.3d 1105, 1110 n. 5 (9th Cir.1999). Furthermore, the only time the term "discretion" is used in the Plan language is in relation to the Committee's instructions to the Trustee, and not in regard to the Committee's benefits decisions. De novo review therefore applies to the Committee's decision to deny benefits.
 
 
 44
 The employees make three allegations in support of their claim that Gore violated the terms of its Plan. They allege that the Committee "ignored the facts and the law" in construing "layoff" to mean just a temporary loss of employment. They also assert that the Committee ignored the fact that the Plan language was altered from 1974, when it defined a short-term period of absence as "any layoff due to lack of work for a period of four (4) weeks or less," to 1998, when the word "layoff" was not specifically defined as a short period of time. Lastly, they allege that the Committee ignored its communications with its employees describing the loss of employment as a "layoff."
 
 
 45
 The employees' contentions fail. The Committee did not ignore the facts and the law when it determined that a "layoff" under this regulation connotes a temporary absence. A memorandum from Plan counsel Brown (Brown Memorandum) to the Committee is clearly concerned with the meaning of the term "layoff" and cites several cases supporting the definition ultimately applied by the Committee. Most importantly, the Plan clearly states in section 21.1 that "The provisions of the Plan shall be construed, administered, and enforced according to the laws of the United States and the State of Delaware." Plan section 4.5.1 and the elapsed-time regulation's severance from service provision are essentially identical. Accordingly, we cannot say that the Committee's decision is contrary to fact or law in light of the validity of the elapsed-time regulation and our holding that the term "layoff" in that regulation connotes a temporary absence.
 
 
 46
 The employees' second argument must fail too. The fact that the old Gore benefits plan described the term "layoff" as a short-term loss of employment is, without more, insufficient to show that the Committee has since changed its construction of the term to include permanent layoffs. The employees have offered no evidence supporting such an interpretation. Rather, the reasonable inference is that the 1974 Plan language was changed to reflect the 1976 promulgation of the elapsed-time regulation.
 
 
 47
 The employees' third contention is equally untenable. The Brown Memorandum clearly states that the employees were told that they were being laid off. There is no evidence to support the employees' argument that the Committee ignored the fact that the employees had been told on certain occasions that they were going to be laid off. Rather, the Brown Memorandum, and the letter denying benefits to Johnson, suggest that the Committee recognized that the employees had been told they were going to be laid off, acknowledged that they had also been told that they were being permanently terminated, and decided to interpret "layoff" to mean only a temporary loss of employment.
 
 
 48
 V. Did the Employees Have Standing to Assert Violations of ERISA's Disclosure Requirements?
 
 
 49
 The employees assert that the district court improperly found that they lacked standing to assert violations of ERISA's disclosure requirements. In order to challenge a benefit plan's failure to comply with ERISA's disclosure requirements, the employees must "have a colorable claim that (1) [they] will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." Firestone, 489 U.S. at 117-18, 109 S.Ct. 948. The district court properly held that because the employees' claims fail, as they were permanently terminated and not temporarily laid off, they are without a colorable claim for benefits. See Mead v. Intermec Techs. Corp., 271 F.3d 715, 717 (8th Cir.2001) (holding that where each claim for short-term disability benefits is dismissed on summary judgment, petitioner is not a plan participant because he has no colorable claim for benefits). Therefore, the employees lacked standing to assert a violation of ERISA's disclosure requirements.
 
 
 50
 VI. Did the District Court Abuse Its Discretion in Denying the Employees' Motion to Amend to Add Claims of Fiduciary Duty?
 
 
 51
 The employees also appeal the district court's denial of their motion to amend the complaint to add claims of fiduciary duty. The district court determined that such an amendment would be futile. The denial of a motion to amend a complaint is reviewed for abuse of discretion. See Yakama Indian Nation v. Wash. Dept. of Revenue, 176 F.3d 1241, 1246 (9th Cir.1999). Five factors are taken into account to assess the propriety of a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. See Nunes v. Ashcroft, 348 F.3d 815, 818 (9th Cir.2003). "Futility alone can justify the denial of a motion to amend." Id.
 
 
 52
 The district court advanced two reasons to support its denial. First, the court held that 29 U.S.C. § 1132(a)(1) already provided the employees with adequate relief. Under section 1132(a)(1), a civil action may be brought by a participant or beneficiary to recover benefits owed. The employees contend that although relief was potentially available under this section, they wanted to amend in order to obtain the equitable relief that would be available under section 1132(a)(3) for breach of fiduciary duty. 29 U.S.C. § 1132(a)(3) provides that a civil action may be brought for broad injunctive or equitable relief. However, when relief is available under section 1132(a)(1), courts will not allow relief under § 1132(a)(3)'s "catch-all provision." See Varity Corp. v. Howe, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); Bowles v. Reade, 198 F.3d 752, 759-60 (9th Cir.1999).
 
 
 53
 Second, the court emphasized that the employees admitted that their allegations of breach of fiduciary duty merely restated the allegations they made in support of their initial standard of review motion. The employees admitted to filing the motion to amend to add these counts only to preserve their right to appeal the initial standard of review order. As the district court properly held, the employees could have appealed that decision without including these counts in the complaint.
 
 
 54
 Given that 29 U.S.C. § 1132(a)(1) already provided an adequate remedy for the employees, and that the employees admitted to filing the motion to amend to add claims for breach of fiduciary duty for the unnecessary purpose of preserving their rights to challenge the district court's standard of review rulings, we find that the district court did not err in denying leave to amend the complaint to add the claims of breach of fiduciary duty.
 
 
 55
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Gore suggests that the issue of the validity of the regulation was not preserved, but we may affirm on any ground supported by the recordSee City of Saint Paul, Alaska v. Evans, 344 F.3d 1029, 1033 (9th Cir.2003).
 
 
 [2]
 Plan Section 18.3 reads: "The Committee shall administer the Plan in a uniform, nondiscriminatory manner for the exclusive benefit of the Participants and their Beneficiaries. The Committee shall establish and maintain Accounts and records to record the interest of each Participant, Inactive Participant, and their respective Beneficiaries in the PlanThe Committee shall make such rules, regulations, interpretations, discussions, and computations as may be necessary. Its decision on all individual matters will be final" (emphasis added). Plan Section 18.5 reads: "The Committee shall have all powers which are reasonably necessary to carry out its responsibilities under the Plan. It may act as provided herein and shall give instructions to the Trustee on all matters within its discretion as provided in the Plan and Trust Agreement" (emphasis added).